#26345-a-JKK

**2013 S.D. 87**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ROBERT LEE THOMPSON,                                Petitioner and Appellant,

    v.

DOUGLAS WEBER, WARDEN
OF THE SOUTH DAKOTA
STATE PENITENTIARY, OR
HIS SUCCESSOR IN OFFICE,                            Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STEVEN R. JENSEN
Judge

* * * *

MARGARET V. GILLESPIE of
Gubbrud, Haugland & Gillespie, LLC
Alcester, South Dakota                              Attorneys for petitioner
                                                    and appellant.


MARTY J. JACKLEY
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                               Attorneys for respondent
                                                   and appellee.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 27, 2013
OPINION FILED **12/04/13**

#26345

KONENKAMP, Justice

[¶1.] Petitioner, Robert Lee Thompson, was convicted by a jury in 1995 of child rape, sexual contact, disseminating harmful material to minors, and indecent exposure. In the same trial, he was acquitted of raping two other children. Ten years later, in his second habeas corpus proceeding, the counseling records for the child he was convicted of raping were first disclosed. Thompson argued that he was prejudiced by the State's suppression of these records, because, had they been disclosed in 1995 when they were requested and ordered to be turned over, the jury would have acquitted him of all rape charges. Although the habeas court agreed that the evidence could have impeached the child's testimony and was suppressed by the State, it denied relief, ruling that Thompson had not established prejudice.

**Background**

[¶2.] In March 1994, after learning about "good" touch and "bad" touch in church classes, C.B., then age seven, told her father that two years earlier "Uncle Bob" (Thompson) made her watch dirty movies. She shared this with her father after he came home with movies for his children to watch that evening. He relayed the information to C.B.'s mother, Penny, and his sister-in-law, Kim B. Penny told C.B.'s school counselor, who reported the abuse to Carol Madsen of Child Protection Services in Nebraska. Madsen arranged for C.B. to be interviewed by Kathy O'Brien, a licensed social worker experienced in interviewing sexually abused children.

[¶3.] C.B. told O'Brien that when Uncle Bob lived in South Dakota, he used to babysit her and her sister, A.B. C.B. disclosed that Uncle Bob made her watch a

-1-

dirty movie she called the "cowboy" movie, which began with men and women wearing cowboy outfits. She said that Uncle Bob's pants were down and his hand was moving on his penis and "white" and "yellowish" "stuff would splatter out" of his penis. She said that Uncle Bob told her he would kick her in the face if she would not watch the movie. C.B. also claimed that Uncle Bob said he would kill her mom and dad if she told. She made no claim that Uncle Bob touched her.

[¶4.] Uncle Bob (Thompson) was married to Mary, the sister of C.B.'s father. Mary and Thompson did not have children of their own, but cared regularly for the many children in the B. extended family, including the daughters of Kim B. When Thompson would babysit these children, Mary was not always at home. She worked varying hours as a nurse, and Thompson was unemployed. During these times, Thompson cared for C.B. regularly because C.B.'s mother was on bed rest with her pregnancy and C.B.'s father worked during the day.

[¶5.] After O'Brien interviewed C.B., Chief of Police Avery "Skip" Ensley of North Sioux City, South Dakota, began a formal investigation. On March 28, 1994, he completed a warrant application for Thompson's arrest. The application was based on allegations that Thompson disseminated harmful material to minors, engaged in sexual contact with a child under sixteen years old, and indecently exposed himself. Thompson lived in Nebraska at the time.

[¶6.] On April 4, 1994, Chief Ensley interviewed Thompson in Nebraska. Thompson came to the interview voluntarily and was informed by Chief Ensley that he was not under arrest. In a closed-door interview that lasted about an hour and a half, Thompson admitted that he exposed C.B. to a pornographic movie and

masturbated in front of her. He also admitted that C.B. touched his penis. The interview was videotaped. Thompson then wrote a confession, but mentioned nothing about the touching. Thompson was indicted on charges of sexual contact with a child under sixteen, indecent exposure, and disseminating harmful material to minors.

[¶7.]     Dr. John Shelso performed a medical examination of C.B. He documented his examination with colposcopic photographs, which were later transferred to slides. Based on his physical examination, he found signs that C.B. was vaginally penetrated. The slides confirmed his observations. The results of this examination were shared with Penny and Chief Ensley.

[¶8.]     C.B. began counseling with Nancy Hines from Associates for Mental Health in Sioux City. In her notes about a telephone call from Penny on April 26, 1994, Hines wrote that Penny told her that the medical exam indicated evidence that C.B. was vaginally penetrated. Penny told Hines that law enforcement investigators would like C.B. to talk about what happened so rape charges could be filed. But nothing in the April counseling records reveals any claim from C.B. that Thompson touched her. These counseling records were not given to Thompson's lawyers until 2011.

[¶9.]     On April 28, 1994, C.B. testified at a preliminary hearing. She said Thompson did not touch her. On that same day, O'Brien conducted a forensic interview of Ch.B. (age twelve) and V.B. (age eleven). These girls are Kim B.'s daughters. (Kim B. was on the phone with Penny when C.B.'s father told Penny that Uncle Bob made C.B. watch dirty movies.) O'Brien later testified that she

interviewed Ch.B. and V.B. for "exploratory" purposes, because C.B. had claimed that her cousins in the B. extended family were at Thompson's home when Thompson made her watch the pornographic movies. Over the course of the investigation, O'Brien interviewed at least 21 children in the B. extended family. During her "exploratory" interview of Ch.B. and V.B., additional allegations against Thompson arose. Ch.B. and V.B., like C.B., said that Thompson made them watch dirty movies and, like C.B., said Thompson did not touch them.

[¶10.] Dr. Gary Carlton examined Ch.B. and V.B. in May 1994 and documented the examination with colposcopic photographs. Based on the photographic evidence, Dr. Carlton noted evidence suggesting that V.B. was vaginally and rectally penetrated and Ch.B. was rectally penetrated. The girls' mother, Kim B., later testified that she shared the results of this medical examination with Ch.B. and V.B.

[¶11.] On May 13, 1994, Thompson posted bond and was released. Upset by his release, the B. family convened what has later been called the "family meeting." During this meeting, which occurred mid-May 1994, Ch.B., V.B., C.B., and Kim B., gathered in a room and talked. Ch.B., V.B., and C.B. later testified at trial that they had talked together about what Thompson did to them. The family members had also met with Chief Ensley when he hosted a barbeque for them at his home.

[¶12.] On May 17, 1994, after the family meeting, Kim B. and her husband took their daughters, Ch.B. and V.B., to see Chief Ensley. The girls told him that they had been sexually penetrated by Thompson. Chief Ensley began to ask the girls about the details, but they were reluctant to talk. The girls said that they

would feel more comfortable talking to O'Brien, which they did that same day. During O'Brien's separate interviews of Ch.B. and V.B., the girls each said that Thompson had raped them in 1992. They explained to O'Brien that they did not know they had been raped until their mother told them they had.

[¶13.]    On May 25, 1994, C.B. reported to her counselor that Thompson had digitally penetrated her. In that same counseling session, C.B. talked about the fact that she had recently visited with her cousins who had also been abused by Thompson. Because the counseling records were not given to defense counsel until 2011, Thompson's counsel was unaware of C.B.'s May 1994 disclosure during the 1995 trial.

[¶14.]    In June 1994, Thompson was indicted on charges of first degree rape of V.B. and second degree rape of Ch.B. At that time, no charges were brought against him for the rape of C.B., even though C.B. had disclosed in her May counseling session with Nancy Hines that Thompson digitally penetrated her vagina, because C.B. had not yet disclosed the rape to her parents or Chief Ensley.

[¶15.]    On September 28, 1994, C.B. participated for the first time in group therapy, during which she wrote "My Abuse Story." V.B. had begun group therapy earlier in the month, but on November 15, 1994, she joined a different group. It is likely that V.B.'s new group was the same as C.B.'s because in C.B.'s individual counseling notes, there is a reference to C.B. being in the same group as one of her cousins. C.B.'s group therapy notes and her "My Abuse Story" were not disclosed to Thompson's attorneys until the second habeas proceeding in 2011.

[¶16.] On December 12, 1994, C.B. and her mother met with Chief Ensley. C.B. told him that Thompson digitally penetrated her vagina, while he was lying on the couch and she was standing upright, during one of the times Thompson babysat her and her sister.[1] To discuss the abuse with C.B., Chief Ensley used a body diagram never made available to Thompson's defense counsel. Because C.B.'s counseling records were not disclosed, Thompson's counsel was under the impression that this December meeting was the first time C.B. claimed rape.

[¶17.] In May 1995, Thompson's jury trial commenced on the charges of disseminating harmful material to minors, sexual contact (C.B.), first degree rape (V.B.), second degree rape (Ch.B.), and indecent exposure. During a break in the proceedings, a juror told one of the B. family members that Thompson would be found guilty, which information was relayed to the court. The court declared a mistrial.

[¶18.] After the mistrial, Thompson was indicted on an additional charge of first degree rape of C.B. In August 1995, C.B. testified at a preliminary hearing that Thompson digitally penetrated her. Penny testified that since April 1994, C.B.

---

1. This incident was further described in Nancy Hines's April 26, 1995 letter to Carol Madsen of Iowa DSS Child Protection Services, a letter not disclosed until April 2011:

   C.B. and A.B. "took a bath together and her Uncle Bob sat out on the couch in the living room continuing to watch movies. After they, the girls, both got their pajamas on, her Uncle Bob asked [C.B.] to come over to him. She said at that point she did not have any panties on. She went over to him and he touched her clitoris and put his finger in her vagina. She told me that it hurt very bad and that she started crying at that time. He then asked [A.B.], her little sister, to come over and [C.B.] reported to me that he did the same thing to her."

had been in counseling with Nancy Hines and in group therapy. Following the preliminary hearing, all charges related to Ch.B., V.B., and C.B. were joined, over Thompson's objection, and on October 30, 1995, the matter proceeded to a jury trial.

[¶19.] At trial, Thompson was represented by Michael J. McGill and Robert B. Freiberg. John P. Slattery was the State's Attorney. In support of its case against Thompson, the State offered the testimony of the doctors who examined the girls, the girls' mothers, C.B.'s father, Chief Ensley, Kathy O'Brien, and an aunt. The defense called Mary Thompson and offered deposition testimony of an expert qualified to evaluate investigations of sexual abuse victims.

[¶20.] Dr. Carlton testified about his examination of Ch.B. and V.B. He described the McCann Classification System, later explained by Dr. Shelso to be "a five-tiered category system," which is a "useful tool to be able to categorize findings done at one center by one examiner and compare them to another center." Dr. Carlton displayed for the jury the colposcopic slides taken of Ch.B.'s and V.B.'s vaginas and rectums. From these slides, he explained the evidence that supported his opinion that V.B. "had findings highly suggestive of both vaginal and rectal penetration." As to Ch.B., he found her vaginal exam normal, but in her rectal exam, there were "striking findings" that she had been "penetrated rectally."

[¶21.] Dr. Shelso explained the different levels in the McCann Classification System. Level one is normal, level two is nonspecific, level three is suspicious, level four is suggestive, and level five is clear evidence of a penetrating injury. He concluded that based on his physical examination, before looking at the slides he prepared, he found evidence suggesting that C.B. had been vaginally penetrated,

which to him, placed C.B. at level four. He stated, "It's something [that] truly did occur, and these types of findings were present with [C.B.]"

[¶22.] Kathy O'Brien testified about the specific protocol she follows and her experience in using it when interviewing children. She described the Child Sexual Abuse Accommodation Syndrome, delineating the common characteristics of children who have been sexually abused. She outlined the interview techniques she used with C.B., Ch.B., and V.B. During the interviews, O'Brien made video recordings, which were not played for the jury. She explained that all three girls identified the same perpetrator, and although they did not disclose rape in the first interview, a subsequent disclosure "falls in so characteristically with the disclosure process[.]" In regard to Ch.B. and V.B., she indicated that her first interviews were "exploratory," because C.B. had said that Thompson had exposed other children to pornographic material, and Chief Ensley had arranged for Ch.B. and V.B. to be interviewed. On cross-examination, O'Brien confirmed that it would be important to the process that there be one interviewer, saying that the disclosure could be interfered with if more than one person conducted interviews. Specifically related to Ch.B. and V.B., she agreed with defense counsel that "there's a risk of contamination," but she "found [the children's] statements credible[.]"

[¶23.] The girls also testified. C.B. was nine at the time. She told the jury that when she was "four or five" Uncle Bob made her watch the "cowboy" movie that "showed people having sex" and that he "was rubbing his penis." She confirmed that Thompson never asked her to touch his penis. When asked if she saw anything come out of his penis, she said she saw "foam," which was "[w]hite." She then

described the rape: after she took a bath at his trailer house, Thompson "stuck his finger up [her] vagina." She agreed it hurt and said that she "started to cry." She said that no cousins were at Thompson's home when the rape occurred. She was afraid of Uncle Bob: "he told me not to tell my family or - - not to tell anybody, otherwise he'll kill my family." On another occasion, when Ch.B. and V.B. were at the trailer, C.B. heard screaming and crying from one of her cousins who was with Thompson.

[¶24.]     V.B. testified next. She was twelve at the time. She was asked if Uncle Bob made her watch a dirty movie, to which she replied, "Yeah." She did not remember what it was called, but said, "It was just kids naked." She said he made her watch the movie in his bedroom and that Ch.B. and C.B. were in the room too. V.B. said that during the movie Thompson was "touching me in my vagina and butt." Thompson put his finger in her butt, she said, and it hurt and she cried. She also said he put his finger in her vagina. He had his pants off and his penis "was ugly and hairy." She said she told her Aunt Mary about it, but Aunt Mary "just ignored" her. V.B. never saw anything come out of Thompson's penis. She did not tell anyone what happened right away because Thompson "said he would kill my mom and dad. . . . If I told."

[¶25.]     Lastly, Ch.B. testified. She was thirteen at the time. Ch.B. is developmentally disabled and suffers from a seizure disorder. She said that she remembered watching a cowboy movie at Uncle Bob's, during which people were "kissing." In addition to V.B. and C.B., she said that A.B. was also present. She said that she, V.B., and C.B. were having a pillow fight and got in trouble with

Uncle Bob. After that, Uncle Bob had her come to the living room. He told her to get on her back, and he cut a rope in half and tied her right arm and right leg down. He pulled her underwear down and put his penis in her vagina. He then turned her over and "touched" her butt, and it hurt, but she denied that he did anything to her butt. On cross-examination, however, she said Thompson stuck "his finger" in her butt. Thompson told her he "would kill her family" if she told anyone.

[¶26.] Following the girls' testimony, Chief Ensley testified. He explained that he first became involved when Children's Services in Woodbury County referred the case to him based on the allegations made by C.B. He reviewed C.B.'s video from her interview with O'Brien and began his investigation. On cross-examination, defense counsel questioned Chief Ensley extensively about his relationship with the B. extended family. He confirmed that he invited the B. extended family to a barbeque at his home. In regard to Ch.B. and V.B., Chief Ensley could not remember if he talked to Kim B. or whether he talked to O'Brien about having the girls medically examined. Nonetheless, he testified that he talked with Ch.B. and V.B. multiple times and talked to the B. family in many phone and in-person discussions.

[¶27.] The defense theory was that the girls' disclosures were tainted by the B. family's involvement and the overzealous and out-of-protocol actions of Chief Ensley. As Mr. Freiberg argued in his closing statement, "there's a potential that these kids have been instilled with a false memory." Defense counsel blamed Chief Ensley, who "didn't have the evidence to go on," but conducted "dozens of interviews" without preserving any notes or recordings, and repeatedly interrogated

the girls, possibly "telling them what happened." "They trusted Skip [Ensley]," counsel argued: "[i]f he told them, they probably believed it."

[¶28.]     Defense counsel focused cross-examination of the State's witnesses on the timing of and inconsistencies in the girls' disclosures. When C.B. testified, she was questioned about not having mentioned being touched by Thompson when she testified at the preliminary hearing and when she spoke with Kathy O'Brien. Each time C.B. responded, "I don't remember." She acknowledged the meeting in May of the previous year when Thompson's abuse was discussed with Aunt Kim, V.B., and Ch.B. After this meeting, V.B., Ch.B., and C.B. all changed their previous renditions to indicate that they had been sexually abused.

[¶29.]     Defense counsel called an expert, Karen Ham, who testified by deposition on children's memories and suggestibility. She explained that proper protocol suggests the use of an integrated team approach to child abuse investigations. Ham criticized Chief Ensley's conduct in the case, faulting his communications with and repeated interviews of Ch.B. and V.B. in May 1994. Ham thought Chief Ensley had contaminated the children's disclosures. As to C.B., however, Ham, through defense counsel, was under the impression that C.B. did not claim until December 1994 that Thompson raped her, which was much later than Ch.B.'s and V.B.'s disclosures. Therefore, defense counsel felt that Ham could not impeach C.B.'s disclosure as forcefully as she was able to with the cousins' disclosures. Defense counsel considered C.B. a more credible witness, testifying to this belief during the second habeas hearing.

[¶30.]     The jury found Thompson guilty of first degree rape of C.B., sexual contact with her, indecent exposure, and disseminating harmful materials to minors.  He was acquitted on the two counts of rape against Ch.B. and V.B.  He was sentenced to life in prison on the first degree rape conviction, twenty years for sexual contact to be served concurrent to the life sentence, and consecutive sentences of one year in jail and a $1,000 fine for disseminating harmful material to minors and indecent exposure.  On his direct appeal to this Court, we reversed the sexual contact conviction, but affirmed the other convictions.  *See State v. Thompson*, 1997 S.D. 15, 560 N.W.2d 535.  The sexual contact conviction was reversed because there was "not a single fact in this evidence that corroborates [Thompson's] admission that C.B. touched his penis.  C.B. testified at trial and at all times steadfastly denied that such contact ever occurred and there [was] no physical or circumstantial evidence that establishe[d] otherwise."  *Id.* ¶ 38.

[¶31.]     Thompson petitioned for a writ of habeas corpus in September 1997.  After a hearing, the habeas court quashed the petition.  A certificate of probable cause was denied by both the habeas court and this Court.

[¶32.]     In October 2003, Thompson again petitioned for a writ of habeas corpus.  Represented by new counsel, Thompson asserted multiple deficiencies, including his trial counsel's failure to obtain C.B.'s counseling records.  Rejecting all Thompson's claims, the second habeas court, in a memorandum decision issued in June 2007, ruled that the first habeas counsel was not ineffective and denied all other relief based on res judicata. Specifically related to C.B.'s counseling records, the second habeas court noted: "the [first] habeas court found trial counsel did

obtain all the records and did a complete review of these records. This finding is supported by a reading of the transcript from the first habeas hearing." Thompson moved the second habeas court to reconsider its ruling. A hearing was held in May 2011, to reconsider several issues, including whether Thompson's trial counsel and first habeas counsel were ineffective for failing to obtain C.B.'s counseling records.

[¶33.]    In June 2011, the second habeas court issued a memorandum decision, resolving all remaining issues.[2] Because this appeal concerns only C.B.'s counseling records, we limit our analysis to that question. The habeas court recognized that while Thompson received C.B.'s medical and school records at trial and in the first habeas proceeding, "there were additional counseling records for C.B.," which neither trial counsel nor Thompson's first habeas counsel received. Therefore, the court addressed the substance of Thompson's claims that counsel was ineffective and that the State committed a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[¶34.]    In its memorandum decision, the second habeas court noted that a *Brady* violation occurs when (1) "[t]he evidence at issue [is] favorable to the [accused] because it is exculpatory or impeaching," (2) the "evidence [was] suppressed by the State either willfully or inadvertently," and (3) "prejudice [has]

---

2.    Before the habeas court addressed the substance of Thompson's petition, it assessed whether Thompson's claims were untimely under SDCL 21-27-3.2 *repealed* 2012 S.D. Sess. Laws ch. 118, § 2, and whether it should be dismissed based on res judicata under SDCL 21-27-16.1 *repealed* 2012 S.D. Sess. Laws ch. 118, § 2. Neither of those statutes is at issue in this appeal, and the habeas court did not dismiss Thompson's claims as untimely or on the basis of res judicata.

ensued from the suppression." *See Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999); *State v. Leisinger*, 2003 S.D. 118, ¶ 14, 670 N.W.2d 371, 375. The court found that "the State failed to comply with direct discovery orders of the trial court to produce all the counseling records, including a motion to compel which was granted by the trial court." The prosecutor certainly knew of these materials because the record contains letters from C.B.'s counselor, Nancy Hines, to State's Attorney Slattery in July and October 1995 detailing C.B.'s progress in therapy.[3] According to the second habeas court, "[t]he State's failure to comply with these orders, along with its obvious receipt of a letter from the counselor shortly before trial raise questions about the information available to the State and the State's failure to communicate this information to defense counsel." Yet "the State's file, which may have contained relevant information was destroyed or misplaced by the current or former State's Attorney." Thus, the court concluded that "the evidence does suggest that the State may have willfully or inadvertently suppressed this information."

[¶35.] Nonetheless, the court ruled that Thompson "failed to show prejudice from not having the counseling records at trial." According to the court, although defense counsel was unaware of the exact timing of C.B.'s disclosure in May 1994, "[t]he counseling notes essentially mirror the evidence presented at trial." In particular, at trial, defense counsel was able to show that C.B. initially denied

---

3. Four days before Thompson's jury trial, Nancy Hines sent State's Attorney Slattery a letter dated October 26, 1995, detailing the sexual abuse that C.B. reported she suffered at Thompson's hands and outlining her progress in therapy. *See* footnote 1.

under oath that Thompson touched her and that she talked to her school counselor, parents, a child forensic interviewer, and others and did not disclose that Thompson touched her. Defense counsel highlighted, through C.B.'s testimony, that it was not until after C.B. spoke with her family and had law enforcement contact that she disclosed that Thompson raped her. The habeas court further referred to trial counsel's testimony at the second habeas hearing that C.B.'s "claims of rape were much more credible than her cousins for which verdicts of not guilty were obtained." Thus, except for the exact timing of the rape disclosure, the counseling notes were cumulative of what already was known to the defense at trial.

[¶36.]     Accordingly, the court held that Thompson had "not shown a reasonable probability that the specific timing of the disclosure would have created reasonable doubt in the jurors' minds considering the entire record" and that "the April 21 note and the hypnotism information provide nothing of significance to the evidence presented by the defense at trial." The court issued findings of fact and conclusions of law and an order denying Thompson's amended petition for a writ of habeas corpus. The court also denied Thompson's amended motion for a certificate of probable cause.

[¶37.]     We issued a certificate of probable cause, resulting in this appeal. Thompson raises two issues: (1) he was denied due process because of the State's failure to produce C.B.'s counseling records in violation of *Brady*, 373 U.S. 83, 83 S. Ct. 1194 and *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490

(1995), and (2) his trial counsel and first habeas counsel were ineffective for failing to obtain C.B.'s counseling records.[4]

## Analysis and Decision

[¶38.] Thompson contends that he was denied due process in his 1995 trial when the State withheld C.B.'s counseling records in violation of *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97. In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*; *see Leisinger*, 2003 S.D. 118, ¶ 14, 670 N.W.2d at 374. Undisclosed evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280, 119 S. Ct. at 1948 (citation omitted). A *Brady* violation occurs when (1) "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) the "evidence [has] been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice [has] ensued." *Id.* at 281-82, 119 S. Ct. at 1948.

---

4.    Since habeas corpus is a collateral attack on a final judgment, our standard of review is limited. *Lodermeier v. Class*, 1996 S.D. 134, ¶ 3, 555 N.W.2d 618, 621. Habeas petitioners bear the initial burden to establish a colorable claim for relief. *Jenner v. Dooley*, 1999 S.D. 20, ¶ 11, 590 N.W.2d 463, 468. Correspondingly, the State has only the burden of meeting the petitioner's evidence. *Davi v. Class*, 2000 S.D. 30, ¶ 26, 609 N.W.2d 107, 114. We review factual findings for clear error and legal conclusions de novo. *Meinders v. Weber*, 2000 S.D. 2, ¶ 5, 604 N.W.2d 248, 252 (citations omitted); *Rodriguez v. Weber*, 2000 S.D. 128, ¶ 12, 617 N.W.2d 132, 138.

[¶39.] Here, it is undisputed that C.B.'s counseling records were favorable to Thompson as impeachment evidence. During the 1995 trial, the defense theory was that Chief Ensley and C.B.'s extended family had tainted the girls' disclosures. Defense counsel was able to present evidence to challenge the disclosures by Ch.B. and V.B. based on the fact that they disclosed to Chief Ensley after a family meeting in May 1994. Yet, although defense counsel knew that C.B. had participated in the same family meeting, counsel did not have quite the same evidence with which to attack C.B.'s disclosure. Indeed, at trial, counsel believed that C.B. disclosed the rape to Chief Ensley in December 1994. Had they possessed C.B.'s counseling records, defense counsel could have challenged C.B.'s disclosure with the fact that she told her counselor in May 1994, just after the family meeting, that Thompson digitally penetrated her vagina. Moreover, the counseling records showed that C.B. and her cousin, V.B., were in group therapy together and that C.B. was apparently hypnotized. Certainly, Thompson could have impeached C.B.'s testimony with these parts of the undisclosed counseling evidence.

[¶40.] Does the record support that this evidence was suppressed by the State, either willfully or inadvertently? It is undisputed that Thompson's trial counsel sought discovery of C.B.'s counseling records on multiple occasions. After a preliminary hearing in which C.B.'s mother testified about the fact that C.B. was in counseling and group therapy, Attorney McGill twice wrote State's Attorney Slattery seeking C.B.'s counseling records. These requests went unanswered. What followed were court orders mandating disclosure. But as the second habeas court concluded, "[i]n light of the court orders requiring the State to produce all the

counseling records; the State's receipt of the letter [from the counselor]; and law enforcement's direct contact with the counselor, the evidence does suggest that the State may have willfully or inadvertently suppressed this information."

[¶41.]     Further obscuring the situation, the State's Attorney's file on Thompson's case went missing. The State's Attorney from the first habeas proceeding said that he had the file at that time. He insisted he would not have removed or destroyed it. He left office in 2004. The State's Attorney for the second habeas proceeding said that Thompson's file was gone and that there was a gap in the office files from the mid-80s to the mid-90s. Because the file remains missing, there is no way to know if the State possessed the counseling records in 1995. But a letter in the record from C.B.'s counselor to State's Attorney Slattery regarding C.B., along with the other evidence, supports the second habeas court's conclusion that the State knew of and suppressed the undisclosed evidence willfully or inadvertently.

[¶42.]     Was Thompson prejudiced by the suppression of this evidence? Prejudice ensues when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *See Erickson v. Weber*, 2008 S.D. 30, ¶ 18, 748 N.W.2d 739, 745 (emphasis omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985)). A "reasonable probability" exists when evidence reasonably could "be taken to put the whole case in such a different light [so] as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434-35, 115 S. Ct. at 1566. The test is not for sufficiency of the evidence, but instead, an examination

of the cumulative effect of the suppression, viewing the error in the context of the entire record. *Id.* We must ask ourselves if we are confident the verdict would be the same. *See id.* at 453.

[¶43.] Thompson insists that he was prejudiced because the counseling records show that C.B.'s disclosure was "in the same way" as Ch.B. and V.B., and because the jury acquitted Thompson on the charges related to Ch.B. and V.B., there is a reasonable probability that the jury would have acquitted Thompson on the rape charge related to C.B. Thompson points to "My Abuse Story," written by C.B., in which she wrote that Thompson raped her until she was eight years old. Emphasizing the impossibility of C.B.'s claim — Thompson was arrested four months before C.B. turned eight — he argues that he could have further impeached C.B.'s claims. He also contends that he could have confronted Penny (C.B.'s mother) about her call to Nancy Hines on April 26, 1994, during which Penny told Hines that the medical evidence showed abuse and that law enforcement wanted C.B. to talk about it so rape charges could be filed. Lastly, Thompson contends that had defense counsel known that C.B. was placed under hypnosis, their expert could have testified about the use of memory-enhancing techniques on sexually abused children.

[¶44.] After examining all the record evidence, which includes transcripts from O'Brien's interviews of the children, the notes related to C.B.'s counseling sessions, C.B.'s "My Abuse Story," the group therapy notes, the testimony from the 1995 trial, 1994 and 1995 preliminary hearings, and the evidence and transcripts from the first and second habeas proceedings, we cannot say that the second habeas

court erred in concluding that the suppressed evidence, as a whole, did not put the case in such a different light so as to undermine confidence in the jury's verdict. In fact, even with the counseling records and defense counsel's impeachment of C.B., the jury could have reasonably believed C.B.'s claims and found her more credible than Ch.B. and V.B.

[¶45.] Contrary to Thompson's insistence, C.B.'s disclosure to her counselor in May 1994, although *at the same time* as Ch.B.'s and V.B.'s, was not "in the same way." The jury heard that Ch.B. and V.B. were interviewed only for exploratory purposes on Chief Ensley's suggestion. Kim B., their mother, told Ch.B. and V.B. the results of Dr. Carlton's medical examination — that they had been sexually penetrated. Then Ch.B. and V.B. talked at the family meeting with C.B. about what Thompson had done to them. After being told by their mother that the doctor found evidence that they had been abused and after talking at a family meeting, Ch.B. and V.B. were taken by their parents to tell Chief Ensley that they had been raped, during which they claimed they did not know they were raped until their mother told them they were. C.B., on the other hand, was interviewed by O'Brien because she made a specific claim that Thompson made her watch dirty movies. And, although she disclosed the rape right after the family meeting in May, she made that disclosure to her counselor and did not tell Chief Ensley until December 1994. Moreover, she never claimed that she did not know she was raped until her mother told her she was. Unlike Ch.B. and V.B., C.B. was not told by her mother or anyone else the results of Dr. Shelso's medical examination.

[¶46.]     Not only was C.B.'s rape disclosure in May 1994 not "in the same way" as her cousins' disclosures, the evidence at trial related to C.B. was different from that presented on Ch.B.'s and V.B.'s claims. To summarize: (1) The jury heard that C.B. told her dad that "Uncle Bob" made her watch dirty movies, which later led to O'Brien's forensic interview. The cousins, on the other hand, were referred by Chief Ensley for an "exploratory" interview. (2) Dr. Shelso examined C.B. and concluded that based on his *physical* examination, C.B. had been vaginally penetrated. The cousins were examined by Dr. Carlton, and although he found signs of penetration, it was only after he viewed the colposcopic slides of their vaginas and rectums. (3) C.B. consistently described the scene of the pornographic movie, which Thompson made her watch in the living room while he rubbed his penis. She also consistently described the circumstances surrounding the rape. The cousins, on the other hand, varied in their descriptions of the movie and the rape. V.B. said that kids were in the movie and that she, C.B., and Ch.B. watched it in Thompson's bedroom. She said at one point that the rape happened in the afternoon, but at trial, she said it happened at night. She said she screamed. She also claimed that Thompson penetrated her while they watched the pornographic movie with the cousins in the bedroom. Ch.B. said the cousins watched the movie together, but in the living room. She said she was the second one to get abused and that C.B. was the first. Ch.B. claimed, at one point, that Thompson tied her up and penetrated her vagina with his penis in the living room after Thompson yelled at the cousins in the bedroom for having a pillow fight. Dr. Carlton found no evidence of vaginal penetration of Ch.B. In direct examination, Ch.B. said that other than touching her

butt, Thompson did not do anything to her butt, but on cross-examination, she said she was anally penetrated. (4) Although the jury heard how the B. extended family was greatly involved in the investigation, the jury heard more evidence about Kim B.'s involvement. In particular, Kim B. told Ch.B. and V.B. the results of Dr. Carlton's medical examination. Then Kim B. and her husband took Ch.B. and V.B. to Chief Ensley to report the rape, but the girls said they did not know they were raped until their mother told them they were. The jury heard no evidence that Penny was connected to C.B.'s disclosure. (5) Finally, both O'Brien and the defense expert, Ham, testified that delayed disclosure — child revelation of additional abuse at a later date — is not uncommon, thereby buttressing C.B.'s late disclosure. Although the counseling records reveal that C.B.'s disclosure was at the same time as Ch.B.'s and V.B.'s, the similarities end there, and therefore, there is not a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. As the second habeas court concluded: "Nearly all the information disclosed by C.B. in the counseling notes was known to the defense at trial."

[¶47.] Nonetheless, Thompson argues that there is a reasonable probability that the cumulative effect of C.B.'s counseling records, "My Abuse Story," and the circumstances surrounding her hypnotism would have resulted in his acquittal for the rape charge related to C.B. Indeed, C.B.'s claim in her abuse story that Thompson raped her until she was eight is an impossibility, because she turned eight four months after Thompson was arrested. But, considering the entire evidence, this child-witness's testimony with a four-month discrepancy in memory

does not substantially impeach her credibility. Moreover, although the hypnosis tape no longer exists and C.B.'s counselor told Penny not to show anyone the tape, there is no evidence that C.B. disclosed a perpetrator other than Thompson during hypnosis, or that as a result of the hypnosis, C.B. alleged additional acts of abuse or denied any abuse.

[¶48.]    In the end, the habeas court did not err when it ruled that Thompson failed to establish the requisite prejudice. To prevail on his claim that a *Brady* violation occurred or that his due process rights were violated because his counsel was ineffective, Thompson must establish that there is a reasonable probability that the results of the proceeding would have been different if the suppressed evidence had been disclosed.[5] On the evidence presented, we cannot say that the production of C.B.'s counseling records would have made a markedly stronger case for the defense or a markedly weaker case for the State. *See Kyles*, 514 U.S. at 441, 115 S. Ct. at 1569. More importantly, we think there is no reasonable probability that, had this evidence been timely disclosed to the defense, the result of his trial would have been different.

[¶49.]    Affirmed.

[¶50.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.

---

5.    We need not determine the sufficiency of defense and habeas counsels' performances, because, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Rodriguez*, 2000 S.D. 128, ¶ 29, 617 N.W.2d at 143 (quoting *Strickland v. Washington,* 466 U.S. 668, 697, 104 S. Ct. 2052, 2069, 80 L. Ed. 2d 674, 699 (1984)).