# IN THE COURT OF APPEALS OF IOWA

No. 23-0971
Filed March 5, 2025

IN RE THE ESTATE OF MARGIE L. STACY and THE MARGIE L. STACY REVOCABLE TRUST,

**KATHRYN J. JONDLE,**
        Plaintiff-Appellant/Cross-Appellee,

**vs.**

**MARGARET MAE GILLESPIE, Individually as Proponent of the Margie L. Stacy Revocable Trust,**
        Defendant-Appellee/Cross-Appellant,

**And Concerning**

**JOHN A. BASS, as administrator of the DIANE K. BASS ESTATE,**
        Interested Party.
_____

        Appeal from the Iowa District Court for Polk County, Coleman McAllister, Judge.

        A disinherited heir appeals and a beneficiary cross-appeals from a split jury verdict in an action challenging a decedent's will, trust, and inter vivos land transfer. **AFFIRMED ON APPEAL AND CROSS-APPEAL.**


        Nathan J. Schroeder of Daniels, Hines, Kalkhoff, Cook & Swanson, Cedar Falls, for appellant/cross-appellee.

        Douglas A. Fulton and Allison M. Steuterman of Brick Gentry, P.C., West Des Moines, for appellee/cross-appellant.


        Heard by Schumacher, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Our supreme court has described undue influence as "a slippery concept at best." *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 97 (Iowa 2013). Some of the difficulty comes from the different burdens and standards of proof that are applied depending on whether the undue influence claim involves a testamentary or inter vivos (lifetime) transfer. *Id.* This case involves both types of transfers—with a "trust protector" twist.

Beginning in 2018, when she was in her late eighties, Margie Stacy made a series of modifications to her estate plan for the benefit of youngest daughter, Margaret ("Peggy") Gillespie,[1] culminating in an inter vivos transfer of farmland. Margie also named Peggy as her trust protector which, under the terms of the trust, meant that Peggy's approval and signature were required to amend or revoke the trust. These modifications effectively disinherited Margie's oldest daughter, Kathryn ("Kathy") Jondle.

After Margie passed away in 2021, Kathy brought claims for undue influence, challenging her mother's will, trusts, and farmland transfer. At the jury trial on her claims, Kathy argued that the burden of proof on the challenges to the trusts should shift to Peggy because of the confidential relationship that Peggy shared with their mother. The district court disagreed and instructed the jury that the burden of proof on those claims remained with Kathy. The jury returned a split verdict, and the sisters appealed. Kathy challenges the court's instructions on the burden of proof for her trust contest, while Peggy challenges the sufficiency of the

---

[1] Not all family members involved here share the same last name, but some do. Following the parties' example, we refer to the family members by their first names.

evidence to support a finding of undue influence regarding the farmland transfer and related trust amendment.

## I.      Background Facts and Proceedings

Margie and Richard Stacy married in 1948.  Together they raised four children: Kathy Jondle, James ("Jim") Stacy, Diane Bass, and Peggy Gillespie. Margie and Richard owned a 160-acre farm in Webster County.  The farm is the centerpiece of this dispute.

In 2012, Richard's health began to decline.  Around the same time, the couple started making changes to their estate plans.  Wills executed by Margie in 2010, 2012, and 2013 were introduced at trial.  They reflect an intent for Margie's assets to pass in equal shares to her three daughters or their families.[2]  During these years, Margie and Richard kept their daughters informed about their estate plan and invited them to participate in meetings with their family attorney.

Richard passed away in 2014.  His death sparked animosity between Kathy and Peggy, because Peggy blamed her older sister for moving Richard to the care facility where he died.  Over the following months, Peggy became heavily involved in Margie's affairs.  She began reviewing all of Margie's financial statements and attending meetings with Margie's banker, Cynthia Mayo, who remembered Peggy doing most of the talking.  Peggy also went to meetings with her mother's lawyer. None of Margie's other children were present at these meetings.

---

[2] Two of the wills made no provision for Jim, who had no spouse or children and received government assistance for his chronic health problems.  The parties agree their parents disinherited Jim to ensure he maintained Medicaid eligibility.

In the wake of Richard's death, Mayo encouraged Margie to consider transferring her assets to a revocable trust. Mayo later testified that she proposed this idea after Margie told her about disagreements among her children. According to Mayo, Margie worried about picking sides and admitted that she had trouble denying any of the kids' wishes. On December 3, 2014, Margie settled the Margie L. Stacy Revocable Trust. She transferred to the trust all her personal belongings, her home in Clive, and the Webster County farm. These assets were to be held for Margie's benefit for life and then distributed in equal shares to her children upon her death. Margie appointed herself trustee, named a bank as her successor, and reserved the power to amend or revoke the Trust.

In the years that followed, a dispute percolated over funds Kathy received from Richard before his death and a car loan that Margie co-signed with Kathy. In 2016, Peggy connected Margie with a new attorney, Hope Wood, for the purpose of updating her estate plan to equalize Kathy's debts. Shortly after their first meeting, Margie executed a pour-over will and a durable power of attorney authorizing Peggy to manage her financial affairs. Margie later revoked the power of attorney, informing Wood that the "kids [were] fighting over money" and that she no longer wanted Peggy involved in her finances. But about one month later, Margie sent a letter to Wood requesting that Peggy be re-enlisted as her agent. In another letter, Margie requested that Wood prepare a trust amendment reducing Kathy's distribution by $50,000. Peggy testified that she typed both letters for her mother's signature.

In 2019, Jim's health began to fail,[3] and Peggy helped him move out of his apartment. According to Kathy, her mother was upset by how Peggy handled that situation, and so Margie distanced herself from Peggy again. Kathy contacted a third attorney, Stephen Banks, to help Margie revoke Peggy's power of attorney. Margie named Kathy as her agent for financial matters, and Kathy and Diane as co-agents for health-care decisions. Kathy, Diane, and Margie then met with Mayo at the bank to talk about further restricting Peggy's access to Margie's finances.

When Peggy found out about her sisters' efforts, the family friction turned to flame. Just three days after she was removed as Margie's agent, Peggy took Margie back to the bank to execute another financial power of attorney restoring Peggy's authority. She also blocked Kathy's number on Margie's phone and promised to call the police if Kathy tried to contact Margie. Peggy then arranged for her mother to meet with a fourth attorney, Ross Barnett, to amend the Trust.

On June 13, 2019, Margie signed the Amended and Restated Margie L. Stacy Revocable Trust ("Restated Trust"). As with her previous estate plans, Margie would continue to enjoy the use and income of her assets during her lifetime. But her daughters would not take equal shares. Under the Restated Trust, Kathy and her children would split the proceeds from the sale of Margie's home in Clive. The rest of the trust assets—including the Webster County farm—would pass to Peggy and Diane. The Restated Trust established Peggy as the "trust protector," with the authority to revoke the trust or amend its terms. And it provided: "While the Settlor is alive, [the] Trust Protector's approval and signature

---

[3] Jim later passed away.

is required to amend or revoke this Trust. **The Settlor and Trust Protector must act together to change or terminate this Trust**.” (Emphasis in original). Barnett testified that the trust-protector language restricted Margie's ability to revoke or amend the Restated Trust.

Two weeks after executing the Restated Trust, Margie gave Barnett a handwritten note to be given to Kathy after Margie's death. The note states:

> Kathy
> I'm writing this letter to explain your [in]heritance.
> You have borrowed so much money and taken things promising to make monthly payments that you don't deserve any farm land. You've never paid back any of the money[.] You also put on Facebook that I'm not your mother. . . . So, if I'm not your mother, you don't get the same as Diane and Peggy. You have hurt me for the last time.
> Margie

In August 2020, Margie moved in with Peggy. She was in "frail health," and her doctor had advised her to not live alone. After moving in with Peggy, Margie decided to sell her Clive house to Kathy's son. Barnett advised Margie that selling the house would leave nothing in the trust for Kathy. According to Barnett, Margie explained that she understood the consequences and wanted to proceed. The sale closed in January 2021.

About one month later, Margie decided that she wanted to give the Webster County farm to Peggy only. According to Barnett, Margie said that Diane's health was deteriorating, and she was worried that a sizeable inheritance would disqualify Diane from government benefits. On February 11, 2021, Margie executed an Amendment to the Restated Trust, reducing Diane's share to a $20,000 lump sum and leaving all the farmland to Peggy ("2021 Amendment"). Peggy signed and approved this amendment as the trust protector. The same day, Margie signed a

deed in her capacity as trustee conveying the farm to Peggy ("Farmland Transfer").[4]

Margie died on April 4, 2021. Her 2019 pour-over will was admitted to probate without present administration. Kathy filed a petition at law in the probate action contesting the validity of the 2019 pour-over will, the Restated Trust, the 2021 Trust Amendment, and the Farmland Transfer on undue influence grounds. Kathy also asserted a claim against Peggy for intentional interference with a bequest and sought punitive damages.[5]

At trial, Kathy requested a burden-shifting instruction for the undue influence claims related to Margie's trusts and the Farmland Transfer. Under her proposed instruction, if the jury found Peggy and Margie were in a confidential relationship at the time Margie signed the Restated Trust, the 2021 Trust Amendment, or the Farmland Transfer, "then the burden is on Peggy Gillespie to prove that there was no undue influence." The district court granted Kathy's request for the burden-shifting instruction on the Farmland Transfer but denied it for the trust claims. So, for the trust claims, the jury was instructed: "The law presumes a person is free from undue influence when making a trust or an amendment to an existing trust. To overcome this presumption, the Plaintiff must prove by a preponderance of the evidence" that the Restated Trust and 2021 Trust Amendment resulted from undue

---

[4] Barnett testified that the purpose of amending Margie's trust to redistribute farmland that she intended to gift to Peggy "was just to create a historical record indicating what Margie's intent was" and to ensure the farm would pass to Peggy even if Margie passed away before a deed could be recorded.

[5] Diane was named as an interested party. She passed away in 2022, and her husband John was substituted in her place as administrator of her estate.

influence.[6]  But for the Farmland Transfer, the jury was instructed that if Kathy proved Peggy was in a confidential relationship with Margie at the time of the transfer, the burden shifted to Peggy "to prove by clear, satisfactory, and convincing evidence" that Peggy "acted in good faith throughout the transaction" and that Margie "acted voluntarily with freedom, intelligence, and a full knowledge of all the facts."  The jury returned a verdict finding Peggy had unduly influenced Margie with respect to the 2021 Amendment and Farmland Transfer.  It found against Kathy on each of her other claims.

Both parties appeal the jury's verdicts.  Kathy claims the district court erred by denying her requested burden-shifting instruction for her challenge to the Restated Trust.[7]  On cross-appeal, Peggy contends that the evidence was insufficient to support a finding of undue influence with respect to the 2021 Amendment and Farmland Transfer.

## II.    Jury Instructions

This court reviews challenges to jury instructions for correction of errors at law.  *Burkhalter*, 841 N.W.2d at 97.  "Error in giving or refusing to give a particular jury instruction does not merit reversal unless it results in prejudice to the party." *Wells v. Enter. Rent-A-Car Midwest*, 690 N.W.2d 33, 36 (Iowa 2004).  However, "[a]n instruction that improperly states the burden of proof is a material error demanding reversal."  *Koenig v. Koenig*, 766 N.W.2d 635, 646 (Iowa 2009).

---

[6] The jury received a similar instruction for the will claim.

[7] Kathy also claims that the court erred in instructing the jury on her claim regarding the 2021 Amendment.  Because Kathy prevailed on that claim, she has no right to appeal.  *See Reg'l Util. Serv. Sys. v. City of Mount Union*, 874 N.W.2d 120, 126 (Iowa 2016) ("[A] party need not, in fact cannot, appeal from a favorable ruling.").

### 1. Legal Background

Undue influence is influence that "destroys the free agency of [a] grantor and substitutes the will of another person" for the grantor's own. *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003). When undue influence meddles with a grantor's decision about how to dispose of property during life or after death, interested parties can bring a claim to invalidate that decision. The basic elements of such a claim are well-established:

> (1) The grantor must be susceptible to undue influence, (2) opportunity on the part of the grantee to exercise such influence and effect the wrongful purpose must exist, (3) a disposition on the part of the grantee to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*Geerdes ex rel. Jenkins v. Cruz*, 7 N.W.3d 22, 28 (Iowa 2024) (cleaned up). Despite these well-established elements, determining who must prove them can be tricky because the burden differs depending on whether a testamentary or inter vivos transfer is being challenged:

> [C]ontestants seeking to set aside a will based on undue influence carry the burden of proving the essential elements of the action by a preponderance of the evidence. Persons seeking to set aside inter vivos transfers carry a higher burden of proving their cause of action by clear, satisfactory and convincing evidence. Where a confidential relationship is found to exist, and inter vivos conveyances are challenged, the burden of proof shifts to the benefitted parties to prove—by clear, satisfactory, and convincing evidence—their freedom from undue influence. No such presumption of undue influence exists in the case of a will contest, even where the testator and beneficiary stand in a confidential relationship. But a suspicion of overreaching may arise where the dominant party has participated in the actual preparation or execution of the will.

*In re Est. of Todd*, 585 N.W.2d 273, 277 (Iowa 1998) (internal footnotes and citation omitted). To rebut the presumption of undue influence on an inter vivos transfer

arising from a confidential relationship, "the grantee needs to 'prove by clear, satisfactory, and convincing evidence that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily.'" *Geerdes*, 7 N.W.3d at 29 (citation omitted).

The primary reason for the differing burdens in testamentary and inter vivos transfers was explained by our supreme court over one hundred years ago:

> The doctrine that undue influence is to be presumed as between parties inter vivos, dealing with each other when fiduciary relations exist between them, has no application to testamentary gifts. The theory as to contracts and gifts inter vivos is that a person having need of property, or at least a desire to retain it during life, is not likely to part with it without a measurably adequate equivalent. . . . But the primary presumption on which this whole doctrine rests is entirely lacking in testamentary dispositions. The natural inference that the owner is adverse to parting with his property in the case of gifts and contracts inter vivos is reversed in the disposition of property by will. The design of the testator, as manifested therein, is to give away a part or all he has or may thereafter acquire. He does not undertake to part with its use or enjoyment, for the will speaks only from the time of his death, and therefor its use and enjoyment by him is not interrupted.

*Graham v. Courtright*, 161 N.W. 774, 777–78 (Iowa 1917). Another reason for treating testamentary dispositions differently is that a testamentary beneficiary "is not necessarily a party to the execution of the will and may have no knowledge thereof until years after it has been made." *Id.* at 778. By contrast, the grantee of an inter vivos transfer is more likely to have firsthand knowledge regarding the transaction, putting the grantee in a better position "to present the facts to court or jury." *Id.*

Over the years, challenges to these burden allocation rules have been raised but not decided by our appellate courts. For instance, in *In re Estate of Workman*, 903 N.W.2d 170, 175 (Iowa 2017), a litigant argued that burden shifting

"reflects an outdated distinction between inter vivos and testamentary transfers" and urged the supreme court "to follow Restatement (Third) of Property, which treats both categories of donative transfers the same."[8] But because error was not preserved, the court did not reach the issue. *Workman*, 903 N.W.2d at 176; *see also Geerdes*, 7 N.W.3d at 29 n.5 (noting the appellant did "not argue for any change in our existing legal standards" for undue influence claims). More recently, in *In re Estate of Elsen*, this court was asked to consider whether the burden shifting for inter vivos transfers with a confidential relationship should apply to a revocable trust. No. 21-0959, 2022 WL 3069489, at *5 (Iowa Ct. App. Aug. 3, 2022). We did not decide that question, however, because error was not preserved. *Id.*

There are no such error preservation problems in this case, which requires us to squarely address the applicable burden for an undue influence claim involving a confidential relationship and a revocable trust with a trust protector provision.

### 2. Burden of Proof for Trust Contests

Peggy contends the correct burden in this case is controlled by the supreme court's decision in *Burkhalter*. There, a frustrated beneficiary challenged an eleventh-hour modification to his father's revocable trust. *Burkhalter*, 841 N.W.2d

---

[8] Comment f to section 8.3 of Restatement (Third) of Property instructs:
> A presumption of undue influence arises if the alleged wrongdoer was in a confidential relationship with the donor and there were suspicious circumstances surrounding the preparation, formulation, or execution of the donative transfer, *whether the transfer was by gift, trust, will, will substitute, or a donative transfer of any other type*.

(Emphasis added.)

at 94. The jury found no undue influence, and the beneficiary appealed. The issue on appeal was whether the district court properly instructed the jury regarding the elements of undue influence and applicable standard of proof. *Id.* at 97–98. The supreme court held that a preponderance standard applies but that causation requires clear proof. *Id.* at 106. In reaching its conclusion, the court relied heavily on its will contest case law. *See id.* at 100–01. Peggy argues that *Burkhalter* unified the law of undue influence, and so the same burden rules that apply to will challenges also apply to revocable trusts.

Peggy's gloss overextends *Burkhalter*. The burden of proof was not at issue in that case, and the court said nothing to suggest trust claims are categorically exempt from burden-shifting principles. If anything, *Burkhalter* implied the opposite, stating "that if a confidential relationship exist[s] between the testator and the putative beneficiary, the burden shift[s] 'to the recipient'" to rebut the presumption of undue influence. *Id.* at 100 (quoting *Est. of Todd*, 585 N.W.2d at 276). Because *Burkhalter* did not involve a confidential relationship, the discussion ended there. So that case does not speak to the question before us.

This court's prior decisions are also uninformative. We have sometimes assumed that the party contesting the validity of a revocable trust bears the burden of proof. *See Randall L. Durschmidt Revocable Tr. v. Durschmidt*, No. 22-0102, 2022 WL 5074672, *3 (Iowa Ct. App. Oct. 5, 2022); *In re Ronald R. Oldham Tr.*, 889 N.W.2d 671, 673 (Iowa Ct. App. 2016). In other cases, we have applied the burden-shifting rule. *See Est. & Tr. of Otteros v. Otteros*, No. 07–1115, 2008 WL 2522128, at *4–5 (Iowa Ct. App. June 25, 2008); *In re Est. of Fink*, No. 04-1306, 2005 WL 1398008, at *2 (Iowa Ct. App. June 15, 2005). But none of these

cases required this court to decide which framework was proper. And, as mentioned above, in the one trust case where we *were* asked to confront the issue head-on, error was not preserved. *See Elsen*, 2022 WL 3069489, at *5.

So whether the burden-shifting rule applies in revocable trust contests appears to be a question of first impression. To determine the answer, we look to the nature of the disposition at issue. *See Est. of Todd*, 585 N.W.2d at 277; *In re Est. of Bayer*, 574 N.W.2d 667, 675 (Iowa 1998). Kathy argues the Restated Trust is analogous to an inter vivos gift, particularly because the trust protector provision restricted Margie's ability to amend or revoke the trust. Peggy, on the other hand, argues the Restated Trust was testamentary because Margie did not give up any part of her estate and no rights accrued to any of her beneficiaries at the time the amendment was executed.

"The essential characteristic of a testamentary instrument is that it operates only upon and by reason of the maker's death." *In re Est. of Lundgren*, 98 N.W.2d 839, 841 (Iowa 1959). "By its execution the maker parts with no rights and divests himself of no part of his estate and no rights accrue to, or vest in, any other person." *Id.* While Margie's assets were titled in the name of the trust, she was the sole trustee and beneficiary of the trust during her lifetime and retained control over its assets. Neither Peggy nor the other beneficiaries of the Restated Trust had any right to the property until Margie's death. *See Bryan v. Norwest Bank of Iowa, N.A.*, No. 00-1568, 2001 WL 1658906, at *3 (Iowa Ct. App. Dec. 28, 2001) ("A beneficiary's interest under a revocable trust vests only upon the settlor's death, 'when the trust assets are disposed of according to the terms of the trust document.'" (citation omitted)). Indeed, the Restated Trust expressly provided that

despite the powers granted to Peggy as trust protector, she "shall not amend this agreement to limit or alter the Settlor's right to trust assets."

Margie also retained the ability to amend or revoke the trust during her lifetime, even though Peggy's "approval and signature" as trust protector was required.[9]  We agree with Kathy that the trust-protector restrictions on amendments and modifications to the trust complicate the analysis.  *Cf. id.* ("By definition, when a settlor sets up a revocable trust, he or she has the right to recall the trust at any time, and thereby regain absolute ownership of the trust property." (quoting 76 Am.Jur.2d *Trusts* § 11, at 42 (1992)).  But the key consideration in our view is Margie's retention of a beneficial interest in the trust assets during her lifetime.  *See Lundgren*, 98 N.W.2d at 841; *see also* Restatement (Third) of Trusts § 25(2) (noting the property of a revocable trust "is ordinarily treated as though it were owned by the settlor").  Returning to the reasons for the differing burdens outlined in *Graham*, a settlor like Margie who has retained a life interest in the income and principal of a revocable trust has not "undertake[n] to part with [the] use or enjoyment" of the trust assets.  161 N.W. at 778.  So while Margie's ability to amend or revoke the trust was limited by the trust protector provision, we find the Restated Trust was predominantly testamentary.  *Cf. Upman v. Clarke*, 753 A.2d 4, 10 (Md. Ct. App. 2000) (concluding a revocable trust was "predominantly testamentary" because the settlor "reserved the right to revoke the trust . . . at any

---

[9] The validity of the trust protector provision is not in dispute, and we have not been asked to review the enforceability of a revocable trust that gives a single beneficiary power to veto the settlor's intent to revoke the trust or amend its terms. *See* Iowa Code § 633A.4805(1) (providing a non-exhaustive list of powers a trust protector may be delegated).

time and for any reason" and the beneficiaries "had no right to beneficial enjoyment" of the property until the settlor's death).

For these reasons, we conclude the district court did not err in rejecting Kathy's burden-shifting instruction for the Restated Trust claim. *See* Restatement (Third) of Trusts § 25, cmt. a (noting a "policy of treating revocable trusts and their settlors and beneficiaries in like manner to the treatment accorded testators and will beneficiaries, both during life and after the death of the settlor or testator," which has "long been explicit in the federal income and transfer tax systems").

## III.  Sufficiency of the Evidence

On cross-appeal, Peggy contends the district court erred in denying her motion for directed verdict on Kathy's claims of undue influence with respect to the 2021 Amendment and Farmland Transfer. The parties tried this matter at law and agree that we should review the denial of the motion for directed verdict for errors at law. *Cf. Est. of Todd*, 585 N.W.2d at 275 (discussing the different standards of review under Iowa Code section 633.33 for will contests and challenges to inter vivos transfers).

"A directed verdict is required only if there was no substantial evidence to support the elements of the plaintiff's claim." *Pavone v. Kirke*, 801 N.W.2d 477, 487 (Iowa 2011) (cleaned up). "Evidence is substantial when reasonable minds would accept the evidence as adequate to reach the same findings." *Id.* (cleaned up). But where "reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury." *Id.* "In a will contest, weight and credibility of the evidence are questions for a jury." *Est. of Bayer*, 574 N.W.2d at 670–71.

To find undue influence with respect to the 2021 Amendment and Farmland Transfer, the jury had to conclude that (1) Margie was susceptible to undue influence; (2) Peggy had an opportunity to exercise undue influence; (3) Peggy had a disposition to unduly influence Margie to obtain an improper favor; and (4) the 2021 Amendment and Farmland Transfer were the clear results of undue influence.[10] *See Geerdes*, 7 N.W.3d at 28. Peggy fails to tether her substantial evidence challenge to any one or more of these elements. Instead, she generally argues that Margie's decision to leave the farm to Peggy alone was based on Margie's free will. Peggy emphasizes that Margie had a long history of revising her estate plan and that each of the attorneys she worked with believed Margie was carrying out her personal wishes at the time they assisted her. Peggy also argues that Margie had good reasons to disinherit Kathy, pointing to Margie's June 2019 letter and deteriorating relationship with Kathy during the final years of Margie's life.

Peggy's arguments focus on just one half of a two-sided story. *Est. of Bayer*, 574 N.W.2d at 670 ("Evidence is not insubstantial simply because it may support contrary inferences."). At trial, Kathy presented a counternarrative suggesting her mother's will had been commandeered through Peggy's efforts to

---

[10] With respect to the Farmland Transfer, Kathy was entitled to a presumption of undue influence if Peggy had a confidential relationship with Margie. *Mendenhall*, 671 N.W.2d at 454. Peggy casually argues "the jury did not find (nor was it even asked to determine) that Ms. Gillespie was in a confidential relationship with Margie." Because Margie signed both transfers for the same purpose on the same day, we need not reach the confidential relationship analysis, though we note the jury was instructed on that issue. A finding of undue influence with respect to the 2021 Amendment necessarily entails undue influence with respect to the Farmland Transfer.

influence and isolate Margie during the last five years of her life. To this, Peggy responds only that "[t]here is no evidence of any change in the relationship between [Peggy] and Margie other than Margie moving into [Peggy's] home." But that isn't what the record shows.

Viewing the evidence in the light most favorable to Kathy, *see Pavone*, 801 N.W.2d at 487, a reasonable juror could conclude that Peggy asserted control over her mother's affairs in the years following her father's death. She attended all of Margie's meetings with her banker and attorneys. Peggy secured roles as Margie's trust protector and agent under financial and medical powers of attorney. She successfully reversed two attempts by Margie to revoke her authority. She communicated with Margie's attorneys regarding requested changes to Margie's estate plan. And she worked to isolate Margie from contact with Kathy.

By the time she executed the 2021 Trust Amendment and Farmland Transfer, Margie was in a "frail state" and living in Peggy's home. Her decision to gift Peggy the farmland left her trust devoid of major assets and substantially disinherited her other surviving children. That outcome was antithetical to the design of Margie's wills and trusts predating 2019, and it benefited only Peggy. *See Mendenhall*, 671 N.W.2d at 463 (noting significant indicators of undue influence include the "weakened mental condition of the grantor, relationship of the grantor and the grantee, inequality of distribution, and activity of the grantee"); *Boehm v. Allen*, 506 N.W.2d 781, 784 (Iowa Ct. App. 1993) (stating "[u]nnatural, unjust, or unreasonable distributions" may be circumstantial evidence of undue influence).

We conclude Kathy offered substantial evidence to show that Margie was susceptible to undue influence, that Peggy had the opportunity and disposition to unduly influence Margie, and that the 2021 Amendment and Farmland Transfer were the clear result of that influence. The district court correctly denied Peggy's motion for a directed verdict.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**