#30310-a-SRJ
**2023 S.D. 62**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

ASHLEY ELIZABETH PELTIER,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JANE WIPF PFEIFLE
Judge

* * * *

KYLE BEAUCHAMP of
Colbath and Sperlich
Rapid City, South Dakota          Attorneys for defendant
                               and appellant.


MARTY J. JACKLEY
Attorney General

PAUL SWEDLUND
Solicitor General
Pierre, South Dakota              Attorneys for plaintiff
                               and appellee.

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 7, 2023
OPINION FILED **11/29/23**

#30310

JENSEN, Chief Justice

[¶1.]        Ashley Peltier was convicted of first-degree manslaughter for the death

of her boyfriend, James Rice.[1]  At trial, Peltier moved for a judgment of acquittal,

which the circuit court denied.  Following the trial, Peltier moved for a new trial,

arguing the State committed a *Brady* violation when it conducted an interview a

week before trial, provided her with a written summary report of the interview, but

failed to provide the audio recording.  The circuit court denied Peltier's motion.

Peltier was sentenced to forty years in prison with twenty years suspended.  Peltier

appeals, challenging the court's denial of the motion for a new trial, the sufficiency

of the evidence, and the court's sentence.  We affirm.

**Factual and Procedural Background**

[¶2.]        Peltier and Rice lived together in an apartment in northern Rapid

City.  They began a long-standing relationship after meeting in 2016 while involved

in illegal drug activity.[2]  Peltier and Rice regularly used methamphetamine at the

time.  The two later—together and voluntarily—quit using meth and had been

sober from the drug for approximately four years.  The couple had two children

together, and both children lived at their apartment.  While Peltier said the couple

"had [its] good days," she also claimed she was subjected to physical assaults and

---

1.      Rice was in the middle of changing his name at the time of his death.  He was
        referenced as both James Rice and Stanley Kennard III during trial.

2.      Peltier referred to where she and Rice met as a "trap house" and defined it as
        where individuals "get high off of meth with other users who are doing the
        same substance."

domestic violence by Rice during their relationship. However, there was only one such reported incident prior to Rice's death.

[¶3.]     On June 8, 2021, the couple planned a small celebration with their two children, in preparation for Rice's thirtieth birthday the next day. The couple ran some errands early in the evening, picking up a birthday cake and a 20-pack of beer, before eventually returning to their apartment. They watched television and drank beer throughout the evening. Rice's nephew visited the apartment and drove Rice to purchase more beer before leaving.

[¶4.]     Peltier put the children to bed between 7:30 and 8:00 p.m. Afterwards, Rice and Peltier continued to spend time together in the living room of their apartment. Later, an argument developed concerning Peltier's past relationships and accusations of infidelity that became very heated. Peltier claimed she attempted to diffuse the situation by getting up from the couch and heading toward the couple's bedroom before Rice physically assaulted her by pushing her and then choking her, until she was able to free herself by pushing Rice off.

[¶5.]     Peltier then ran into the kitchen and grabbed a paring knife. Rice entered the kitchen and began walking toward Peltier. She raised the knife above her head and told Rice to stay away. Rice initially backed away but then approached Peltier again. Peltier claimed that she jabbed the knife toward Rice as another warning sign for him to stay away, and in doing so stabbed him in the chest. Rice wrestled Peltier to the floor and attempted to take the knife away from her. But before Rice could successfully retrieve the knife, Peltier noticed blood dripping onto her and yelled at Rice that he was bleeding.

[¶6.]    Rice and Peltier both called 911 and requested emergency medical services.  Before Peltier was done talking to 911, Rice walked out of the apartment and collapsed on the steps leading into the apartment building.  Peltier remained in the apartment and informed the 911 dispatcher what had happened.  Both law enforcement and medical services arrived at the apartment, located Rice, and began tending to his injury.  Medical personnel were able to transport him to the hospital before he died.  Meanwhile, other law enforcement officers spoke to Peltier inside the apartment.

[¶7.]    Peltier primarily spoke to Officer Brandon Bassett while Officer Karen Bicskei took pictures of the scene and collected evidence.[3]  Peltier was later transported to the Criminal Investigation Division (CID) in downtown Rapid City, where she was interviewed by investigators.  There, Peltier learned that Rice had died.  Peltier was eventually arrested and told she was being charged for Rice's death.

[¶8.]    Peltier was indicted for second-degree murder as defined in SDCL 22-16-7.[4]  Leading up to trial, the State interviewed several members of Peltier's family to investigate allegations of domestic violence between Rice and Peltier.  The State initially interviewed four of Peltier's family members, prepared written

---

3.    Officer Bicskei also administered a preliminary breath test on Peltier, which registered a .062.  Law enforcement also contacted Rice's sister to pick up and care for the children while the investigation was ongoing.

4.    "Homicide is murder in the second degree if perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child."

reports of the interviews, and placed corresponding audio recordings of the interviews in a discovery outbox at the State's Attorney's office. Peltier's attorneys subsequently picked up the audio recordings from the outbox. On November 15, 2022, a law enforcement investigator interviewed William High Hawk, Peltier's brother, over the phone. The investigator made an audio recording of the interview and prepared a written report. The written report was sent to Peltier's defense attorneys on November 16 and the recording was placed in the discovery outbox at the State's Attorney's office that same day. Peltier's attorneys did not pick up the audio recording or listen to it until after the trial was completed.

[¶9.] Peltier's trial was held November 28, 2022, through December 1, 2022. During its case in-chief, the State presented evidence through various witnesses. Law enforcement personnel testified about arriving on scene, tending to Rice's injury, speaking to Peltier in the apartment, and interviewing Peltier at the CID. The State's case was premised on statements made by Peltier to law enforcement on June 8 and June 9 suggesting that she was the aggressor. The testimony produced through the law enforcement witnesses included Peltier's statements that "she got in his face" and that "she could have backed off" but she "just kind of got fed up with his bull****". Peltier was also asked by law enforcement, "Do you think he was going to injure you tonight?" To which Peltier responded, "No. I think I just got too heated. I just snapped." Peltier also told law enforcement that she had lost patience with Rice and grabbed the knife to "prove a point." The State also presented evidence through Rice's nephew, 911 operators, a forensic scientist, and the pathologist who performed Rice's autopsy.

[¶10.] Peltier's defense consisted of testimony from two law enforcement officers, a domestic violence expert, and herself. The law enforcement officers testified regarding the 2017 report of domestic violence between Rice and Peltier. Peltier, testifying in her own defense, described multiple prior instances where Rice had become physical with her prior to June 8, 2021. She also described Rice's alleged assaultive conduct on the night of June 8, claiming Rice had shoved her onto a chair so hard that her glasses fell off and he then began choking her by impeding her breathing. At that point, Peltier claimed she freed herself, ran to the kitchen, and grabbed a knife, as Rice continued to walk toward her. The domestic violence expert explained the general characteristics and dynamics of a relationship involving domestic violence, including reasons why domestic abuse victims do not report abuse.

[¶11.] The State's primary theory at trial was that Peltier had committed second-degree murder and that she gave fabricated testimony that Rice had assaulted her after she initially admitted she had attacked Rice. The jury was also instructed on lesser included charges of first-degree manslaughter (SDCL 22-16-

15(4))[5] and second-degree manslaughter (SDCL 22-16-20)[6]. At the close of the State's case and at the conclusion of the evidence, Peltier moved for a judgment of acquittal, arguing that the State had failed to present evidence of a depraved mind necessary for second-degree murder. The court denied both motions. The jury found Peltier guilty of the lesser include offense of first-degree manslaughter.

[¶12.] Peltier moved for a new trial, arguing the State committed a *Brady* violation for its "failure to provide Defense with a phone interview that took place between [the investigator for the Rapid City Police Department] and William High Hawk on November 15th, 2022." Peltier claimed that she was not made aware that a recording of the interview was available for pickup and that the written report was insufficient because "key portions [of the interview] were either quickly summarized or omitted altogether." In considering Peltier's motion, the circuit court concluded that the audio recording was neither suppressed nor was its

---

5. "The elements of the crime of manslaughter in the first degree constituting a lesser degree of the crime of murder, each of which the state must prove beyond a reasonable doubt, are that at the time and placed alleged:
    1. The defendant caused the death of Stanley Kennard III, aka James Rice.
    2. The killing by the defendant was done unnecessarily, either while resisting an attempt by Stanley Kennard III, aka James Rice, the person killed, to commit a crime or after such attempt had failed.
    3. The killing was not excusable or justifiable."

6. "Homicide, the killing of one human being by another, may be manslaughter in the second degree, which constitutes a lower degree of homicide and is a lesser offense than the crime of murder in the second degree or manslaughter in the first degree.
    Any reckless killing of one human being by the act of another which is neither murder nor manslaughter in the first degree and which is not excusable nor justifiable is manslaughter in the second degree."

absence prejudicial. In finding that the interview had not been suppressed by the State, the court determined that:

> In this case, the prosecution provided the summary of the interview to defense a week before trial and identified that there was an audio recording. Further, the witness was one known to defense, being the brother of the Defendant and his location was known as he was incarcerated at the time. Nothing in the lead up to trial prohibited the defense from pursuing the testimony of a known witness. With reasonably diligent effort, Mr. High Hawk's testimony could have been obtained and subpoenaed for trial, well before [the investigator's] report was provided. . . . Finally, Defendant could have asked for the recording made during the interview, as noted in the report.

[¶13.] On the question of prejudice, Peltier claimed that "a major theory of State's case was to attack Ms. Peltier's credibility and to suggest she was falsifying previous bad acts by Mr. Rice." Peltier believed that if she were given the audio recording her "strategy may have changed, including calling Mr. High Hawk as a witness to corroborate Ms. Peltier's own testimony that James Rice negatively affected all aspects of her life." The court concluded that the State had not suppressed the audio recording. Additionally, it concluded that Peltier was not prejudiced by the State's actions. The court noted, "Contrary to what is asserted by the defense . . . nothing that Mr. High Hawk states goes to corroborate any evidence or testimony of Mr. Rice's alleged abuse towards the Defendant. The only such evidence was contended by the Defendant, which was properly weighed by the jury at the time of trial." As such, the court denied Peltier's motion for a new trial.

[¶14.] Prior to sentencing, the court received a presentence investigation report that included victim impact statements from Rice's family and letters of support for Peltier. Additional victim impact statements were received by the court

at sentencing and the court also heard arguments from both parties. The court imposed a sentence of forty years in prison, with twenty years suspended and credit for time served.

[¶15.] Peltier appeals and raises three issues, which we restate as the following:

1. Whether the circuit court abused its discretion when it denied Peltier's motion for a new trial based on an alleged *Brady* violation.

2. Whether there was sufficient evidence to support a conviction for first-degree manslaughter.

3. Whether the circuit court abused its discretion in sentencing Peltier.

**Analysis**

*1. Motion for a new trial*

[¶16.] "This Court reviews the circuit court's 'denial of a motion for a new trial under the abuse of discretion standard.'" *State v. Timmons*, 2022 S.D. 28, ¶ 19, 974 N.W.2d 881, 888 (citation omitted). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Id.* (quoting *State v. Miller*, 2014 S.D. 49, ¶ 11, 851 N.W.2d 703, 706). "[T]he decision whether to grant a new trial is within the sound discretion of the trial court, 'whose superior knowledge of all the facts and circumstances of the case enables him to know the requirements of justice.'" *Id.* (alteration in original) (quoting *State v. Lodermeier*, 481 N.W.2d 614, 626 (S.D. 1992)).

[¶17.]     Peltier claims the State's failure to send the audio recording to her attorneys amounted to a *Brady* violation. She argues that "[h]ad defense been able to review the actual interview, where distinct differences between the report and recording exist, the defense would have changed[.]" As such, Peltier moved for a new trial, arguing the State committed a *Brady* violation by not sending her the audio recording.

[¶18.]     "A *Brady* violation occurs when (1) the evidence at issue [i]s favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence [has] been suppressed by the State, either willfully or inadvertently; and (3) prejudice [has] ensued." *State v. Delehoy*, 2019 S.D. 30, ¶ 25, 929 N.W.2d 103, 109 (alterations in original) (citation omitted). "Prejudice ensues when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Thompson v. Weber*, 2013 S.D. 87, ¶ 42, 841 N.W.2d 3, 13 (citation omitted). "A 'reasonable probability' exists when evidence reasonably could 'be taken to put the whole case in such a different light [so] as to undermine confidence in the verdict.'" *Id.* (alteration in original). Additionally, "it is well settled that 'the good faith or bad faith of the prosecution' is immaterial to a determination whether a *Brady* violation occurred." *Delehoy*, 2019 S.D. 30, ¶ 24, 929 N.W.2d at 109.

[¶19.]     The circuit court did not resolve whether the evidence would have been favorable to Peltier and moved directly to the second and third elements of a *Brady* violation. The court concluded that the State had not suppressed the evidence and that Peltier did not suffer prejudice by not receiving the audio recording.

[¶20.]    On appeal, Peltier argues that the State suppressed the audio recording because "the defense relied on compliance by the State in believing they had received all discovery from the State, especially within one week of trial." But upon review of the record, it is undisputed that Peltier was made aware of the audio recording. The interview summary provided to Peltier read, "On 11-15-22 at 1025 hours, I conducted an *audio recorded telephone interview* of William High Hawk." (Emphasis added). Peltier confirms that "defense counsel reviewed the report" prior to trial.

[¶21.]    The audio recording was made available for Peltier and her attorneys to review, as it was placed in a discovery outbox in the State's Attorney's office. Peltier claims that "counsel for [Peltier] was unaware that a recording corroborating their defense was available." However, the State has historically used this outbox system to provide defense counsel with such discovery—including within this case. Before the State interviewed High Hawk, it had interviewed four other members of Peltier's family. Summary reports were made for all of these interviews and each one began with the same format: "On [applicable date] at [time], I conducted an audio recorded telephone interview of [interviewee]." The four audio recordings were placed in the discovery outbox, and Peltier's attorneys then retrieved the recordings from the outbox. The procedure that was used for the four prior interviews was the same as the procedure used for High Hawk's interview. Further, as the circuit court concluded, "the witness was one known to defense" and nothing "prohibited the defense from pursuing the testimony of a known witness."

[¶22.]     The audio recording of High Hawk's interview was not suppressed by the State, and to hold as much would be inapposite with the facts before us. Therefore, the circuit court did not abuse its discretion when it denied Peltier's motion for a new trial based on a *Brady* violation. We affirm the circuit court's denial of Peltier's motion for a new trial.

### 2.     *Sufficiency of the evidence*

[¶23.]     At trial, Peltier moved for a judgment of acquittal on the charge of second-degree murder, arguing that the State had failed to present sufficient evidence of a depraved mind. She did not make a motion for judgment of acquittal on the two manslaughter offenses that both parties had agreed to submit to the jury as lesser offenses. But we have stated that a motion challenging the sufficiency of the evidence "need not be stated with specificity." *State v. Guthrie*, 2001 S.D. 61, ¶ 46, 627 N.W.2d 401, 420. Assuming the motion challenging the sufficiency of the evidence for first-degree manslaughter was adequately preserved, we conclude that the court did not err in denying the motion.

[¶24.]     "Denial of a motion for acquittal is reviewed de novo." *State v. Smith*, 2023 S.D. 32, ¶ 45, 993 N.W.2d 576, 591 (citation omitted). "A question regarding the sufficiency of the evidence to sustain a conviction is reviewed de novo." *State v. Kwai*, 2023 S.D. 42, ¶ 21, 994 N.W.2d 712, 718 (citation omitted). In looking at sufficiency of the evidence, "[w]e consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Manning*, 2023 S.D. 7, ¶ 27, 985 N.W.2d 743, 752 (citation omitted). Furthermore,

"we 'will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence.'" *Id.* (quoting *State v. Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d 301, 313). "This is because 'the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence.'" *Id.* ¶ 27, 985 N.W.2d at 753 (omission in original) (citation omitted). We therefore "accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Id.* (citation omitted). "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (citation omitted).

[¶25.]     "Homicide is manslaughter in the first degree if perpetrated: . . . (4) Unnecessarily, either while resisting an attempt by the person killed to commit a crime or after such attempt has failed." SDCL 22-16-15(4). On appeal, Peltier argues that the State's evidence negated "essentially all criminal activity" on the part of Rice, and therefore, the State could not have established that the killing occurred while Peltier was "resisting an attempt by [Rice] to commit a crime or after such attempt had failed." Peltier points specifically to the State's claim at trial that Rice was not attempting to commit a crime and that Peltier was the aggressor. But sufficiency of the evidence is not tested solely on the State's case-in-chief. Rather, we look at the evidence as a whole to determine whether any rational trier of fact could have found the elements of first-degree manslaughter beyond a reasonable doubt.

[¶26.]	Evidence of Rice's alleged misconduct was presented to the jury through witnesses for the State and for Peltier. Peltier testified that Rice pushed her during their argument, that she fell back into a chair, and that the push was forceful enough to knock her eyeglasses off her face. Peltier also claimed that Rice was choking her during the altercation and related these facts to multiple witnesses, including law enforcement officers testifying during the State's case-in-chief. Peltier also described several past incidences of domestic violence perpetrated by Rice. Although the State's objective was to minimize evidence that was illustrative of domestic violence—in hopes of negating a self-defense claim by Peltier—evidence was presented that Rice engaged in assaultive behavior. Based on the evidence presented at trial, the jury could have concluded that Rice assaulted Peltier or made a failed attempt to assault Peltier at the time he was stabbed.

[¶27.]	Peltier also argues the evidence was insufficient to prove that Rice's stabbing was unnecessary. Peltier argues that "without contending that [Rice] [engaged] in some criminal activity, the jury could not reach the question of whether the response to the criminal activity was necessary." But as discussed above, the evidence is sufficient for a rational trier of fact to find that Rice was engaging in, or attempting to engage in, assaultive behavior. Evidence was also presented at trial that during the altercation Rice did not possess a weapon, Peltier did not feel threatened, and Peltier *knew she could have walked away* from the situation without resorting to using the knife. Whether Peltier's action was

unnecessary was a question for the jury in weighing the evidence and making credibility determinations.

[¶28.]     Viewing the evidence most favorable to the verdict shows there was evidence from which a jury could find Peltier guilty of first-degree manslaughter as defined in SDCL 22-16-15(4).

### 3.     *Sentencing*

[¶29.]     Finally, Peltier believes her sentence was improper because the circuit court did "not consider[ ] [Peltier's] reaction to the threat posed by [Rice's] assaultive conduct and prejudicial errors arose by the circuit court treating her as solely responsible." "[W]e review the sentencing court's decision for an abuse of discretion." *State v. Mitchell*, 2021 S.D. 46, ¶ 27, 963 N.W.2d 326, 332 (alteration in original) (citation omitted).

[¶30.]     In handing down a sentence, "'[c]ourts should consider the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation[,]' without regarding any single factor as preeminent over the others." *Id.* ¶ 28, 963 N.W.2d at 333 (second alteration in original) (citation omitted).  Further, we have said that "circuit courts must look at both the person before them and the nature and impact of the offense[,]" and should "acquire a thorough acquaintance with the character and history of the [person] before it." *Id.* ¶ 29 (last alteration in original).  "This requires studying 'a defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.'" *Id.*  "Whether evaluating a defendant's general

inclination to commit crimes or the extent of his specific offense, sentencing courts can consider a wide range of information from a variety of sources." *Id.* ¶ 31. "Courts may even consider conduct that was uncharged or served as the basis for charges that later resulted in a dismissal or acquittal as long as the State proves the conduct by a preponderance of the evidence." *Id.*

[¶31.] Peltier argues the circuit court misapprehended the conviction under SDCL 22-16-15(4) at sentencing by considering her to be solely responsible for Rice's death. She cites our decision in *State v. Mitchell*, 2021 S.D. 46, 963 N.W.2d 326, in support of her claim. In *Mitchell*, a case also involving a conviction under SDCL 22-16-15(4), the defendant and the State negotiated a plea agreement where the defendant would plead guilty to first-degree manslaughter and the State would recommend a maximum sentence of sixty years. *Id.* ¶ 11, 963 N.W.2d at 329. The circuit court imposed a 124-year penitentiary sentence. *Id.* ¶ 25, 963 N.W.2d at 332. We noted that in accepting the defendant's guilty plea under SDCL 22-16-15(4), "the court recognized that [the defendant's] use of force against [the victim] was at least partially justified because he was resisting an effort by [the victim] to assault him." *Id.* ¶ 33, 963 N.W.2d at 334. In concluding the court abused its discretion, we stated:

> There is no question that the circuit court exercised a careful review of [the defendant's] history and characteristics, but it *effectively treated [the defendant] as solely responsible for [the victim's] killing without considering [the victim's] own criminal conduct.* As a result, the court overlooked the element of SDCL 22-16-15(4) that contemplates criminal conduct by [the victim] which provided some degree of partial justification for [the defendant's] response. This element, however, was a critical aspect of the case.

*Id.* ¶ 38, 963 N.W.2d at 335 (emphasis added).

[¶32.]    In contrast with the court in *Mitchell*, the circuit court here undoubtedly considered Rice's conduct in the events leading up to the stabbing. The court first considered the traditional sentencing factors, including Peltier's "life, habits, social environment, age, inclination to commit other crimes, family life, [and] previous criminal record." The court also considered Rice's history of abusive behavior, noting:

> James had a domestic violence conviction. And when he was younger, perhaps about five years — four and five years before this June 9th episode, he had some terrible episodes with his mother, where he engaged in some behavior that terrified her, required her to call for help on multiple occasions. And so we don't know if that stopped; we don't know if that type of behavior continued on . . .

[¶33.]    Additionally, the circuit court recognized the mitigating circumstances of Peltier's crime in rejecting the State's request for a sixty-five-year prison sentence, stating "people have asked for six and seven decades in prison. This – I don't find that kind of sentence appropriate. I don't find that—I don't find that this would be an action that would be repeated." Further, the court appropriately considered the jury's verdict for first-degree manslaughter, that Peltier's actions were not justified, Peltier's culpability and responsibility for her actions in using a knife, and that there remained some uncertainty concerning the events that unfolded on June 8, by summarizing "[i]s picking up a knife when you are being—if we take even the State's version that it was this emotional and mental abuse or her version that there was some abuse going on, is picking up a knife the right way to proceed? No. And we certainly will never know exactly what was happening at

that moment, but the jury made a decision and, accordingly, I must make a decision."

[¶34.] After a review of the record we are convinced the court undertook the required considerations based upon the jury's finding that Peltier killed Rice "[u]nnecessarily, either while resisting an attempt by the person killed to commit a crime or after such attempt has failed." SDCL 22-16-15(4). Therefore, the court did not abuse its discretion in sentencing Peltier.

[¶35.] We affirm.

[¶36.] KERN, SALTER, DEVANEY, and MYREN, Justices, concur.