#30929-a-RG
**2026 S.D. 20**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,  Plaintiff and Appellee,

v.

KELLY D. WARFIELD,  Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BON HOMME COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE W. GERING
Judge

* * * *

WANDA HOWEY-FOX of
Harmelink & Fox Law Office, P.C.
Yankton, South Dakota                Attorneys for defendant and
                                     appellant.


MARTY J. JACKLEY
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                 Attorneys for plaintiff and
                                     appellee.

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 10, 2026
OPINION FILED **03/18/26**

GUSINSKY, Justice

[¶1.]        Kelly Warfield was imprisoned at the South Dakota State Penitentiary in Sioux Falls, South Dakota, for prior felony offenses before being transferred to Mike Durfee prison in Springfield, South Dakota.  In April 2021, while imprisoned at Mike Durfee, Warfield was indicted on two counts of simple assault against a Department of Corrections employee and one count of intentional damage to property.  Count 1 for simple assault was charged under SDCL 22-18-1(1) and 22-18-1.05, and Count 2 for simple assault was charged under SDCL 22-18-1(5) and SDCL 22-18-1.05.  Count 3 for intentional damage to property was charged under SDCL 22-34-1(1).  Warfield pleaded not guilty to each offense.

[¶2.]        The charges arose out of an incident at Mike Durfee where Warfield destroyed a computer screen and TV before engaging in a physical altercation with a correctional officer.  The altercation was caught on the prison's video surveillance system, but the video contains a four-second skip in footage.  Warfield appeals his conviction, raising several issues for our review.  We affirm.

## Factual and Procedural History

[¶3.]        In January 2021, Kelly Warfield's cell was randomly selected to be searched by two officers for contraband.  During the search, Warfield stood outside of his cell while two officers examined the inside of his cell.  Upon inspection, Correctional Officer Christopher Day (CO Day) noticed that Warfield's TV lacked proper security stickers, specifically the stickers covering the USB port to prevent unauthorized usage.  CO Day confiscated the TV and testified that when he attempted to remove the TV from Warfield's cell that Warfield "balled his fist and

squared his stance" to prevent CO Day from leaving. Warfield eventually moved out of his way, and CO Day began walking towards the front desk of the prison, which is near the day hall.

[¶4.] Warfield began to follow him, but first returned to his cell and emptied the water from his electric tea kettle (hot pot). Carrying the hot pot with him, Warfield walked down the hallway, down three flights of stairs, and over to the day hall where CO Day was with Warfield's TV. The day hall is a recreational space in the prison containing pool tables and a wall-mounted TV. The front desk overlooks the day hall area, and security cameras record both the front desk and the day hall.

[¶5.] Once CO Day made it to the day hall, he gave Warfield's TV to the officers at the front desk and began to explain the situation. While CO Day and several officers were behind the front desk, Warfield appeared in the day hall. Warfield then used the hot pot to strike and break the computer monitor on the front desk. An officer was seated at the front desk at this time, and the hot pot nearly missed him. This is documented by the prison surveillance footage recording, and Warfield admitted to striking the monitor.

[¶6.] Warfield then turned and moved towards the TV hanging on the wall in the day hall. Video footage and testimony at trial shows him dropping the hot pot before striking the TV with his fist several times, damaging it beyond repair. Warfield alleges that he dropped the hot pot because he did not want to hurt anyone with the plastic component that had come loose and was hanging from the bottom of the kettle. CO Day and the other officers present rushed into the day hall and surrounded Warfield.

[¶7.]     When Warfield turned from the TV to face the entering officers and started walking towards them, Officer Don Schwindt sprayed Warfield with pepper spray, but it did not incapacitate him. Several officers testified that CO Day ordered Warfield to "cuff up," but that he did not comply. Video surveillance shows Warfield then approaching CO Day and throwing multiple punches at him. CO Day does not swing back at Warfield in the video surveillance footage, but instead assumes a defensive position to block Warfield's punches. Warfield landed several punches on CO Day's face and chest. Officer Brian Salts then took Warfield to the ground and handcuffed him. CO Day suffered from whiplash and facial bruising and swelling.

[¶8.]     The prison surveillance cameras captured the incident, but the footage contained a four-second skip in coverage. The skip begins when Warfield turned around after smashing the TV in the day hall, and the footage resumes when Warfield can be seen throwing several punches at CO Day. According to the record and testimony at trial, the skip occurred due to a common bandwidth issue that happens when the 800 cameras at the prison upload data at the same time. This is called "bottlenecking," and it frequently causes short skips in the recording.

[¶9.]     During the discovery process, Warfield received footage from two camera angles overlooking the front desk and the day hall that included the four-second skip. There are three security cameras in the area, but footage from only two of the cameras was provided to Warfield because the third camera did not capture the entire incident.

[¶10.] The prison preserved footage from the two relevant camera angles and uploaded it to a USB drive. A witness at trial testified that the footage cannot be altered at this stage due to the encryption processes. Footage from the third camera was left on the server, but eventually written over in accordance with the system's regular processes. During discovery, Warfield attempted several times to inspect the prison servers, but it is unclear from the record whether that ever occurred. The circuit court signed a court order to allow Warfield to inspect the servers, but the record documents a breakdown in the relationship between Warfield and the expert he retained. Over the course of discovery, Warfield's counsel filed several discovery motions seeking video footage of the four-second skip and other system security details. During a pretrial conference, the circuit court noted that "the State has repeatedly stated that they have produced what is available to be produced and that it is no longer available. Any video could no longer be retrieved" because the footage only exists on the servers for six months.

[¶11.] In October 2021, Warfield filed a pro se motion to dismiss the simple assault Counts 1 and 2 on the grounds that they violated his due process rights and protections against double jeopardy. That motion was denied because he was represented by counsel at the time, and the circuit court advised him to instead communicate with the court through counsel.

[¶12.] Prior to trial, Warfield proposed jury instructions on the right to self-defense. These submitted instructions were ultimately rejected by the circuit court and were not included in the final jury instructions as discussed infra. A jury trial was eventually held on November 14, 2023. At trial, the State called six of the

correctional officers who were present on the day of the incident to testify. They all presented consistent testimony about what occurred. Most of the relevant testimony concerned what transpired during the four-second skip in the video surveillance footage.

[¶13.] Jennifer Buchanan, an employee at Mike Durfee, testified that during the four-second skip, Warfield turned around after striking the TV, "zeroed in on Officer Day," and "went straight up to him and started to punch him" with a closed fist at least twice. Several other officers testified that Warfield approached CO Day with his hands up, and that CO Day did not assault Warfield nor throw a punch at Warfield once he had been hit.

[¶14.] CO Day then testified that another officer—later revealed to be Officer Don Schwindt—first "deployed his pepper spray on Inmate Warfield" while Warfield was "coming towards" CO Day. Then, after the pepper spray was deployed, CO Day testified that Warfield "continue[d]" at him, "[a]nd that's when we [went] hands-on." He testified that he gave Warfield "the directive to cuff up" after Warfield hit the computer monitor, and that Warfield did not respond and did not comply.

[¶15.] As it related to preservation of the security footage, several officers testified that they reviewed the footage at the prison on the day of the incident or shortly thereafter. Officer Walter Kemnitz testified that he reviewed the security footage, but that he did not recall observing a skip in the video. Officer Brian Salts recalled that there *was* a skip on the video at the time they viewed it at Mike Durfee.

[¶16.]     Lee Kaufenberg, an administrative captain in charge of the Special Investigation Unit, testified that he reviewed the surveillance video after the alleged assault. He testified that he noticed a skip, but that there was no way to "recover whatever portion is not recorded." When asked about alternative camera angles, he explained that the two camera angles provided to the defense were the best angles, and that they "showed it the clearest. There might have been a third one that was from a different angle, but it didn't have—have the sightlines that these two showed—that these two were direct sightlines." Tiffany Voigt, another employee at Mike Durfee, similarly testified that she viewed all three video angles available to her, and that none of the cameras showed "an assault by any one officer or anyone else" on Warfield.

[¶17.]     Inmate Marc Jones then testified. Warfield's and Jones' accounts of what occurred on the date of the incident and during the four-second skip are notably different from those of the officers who testified. At the time of the alleged assault, Jones was standing on the stairwell that looks into the day hall when he heard officers tell Warfield to "turn around and cuff up." After this, he testified, Warfield "turn[ed] around, place[d] his hands behind his back, and then the guard picked him up and slammed him on the ground." From his view of the situation, there were seven or eight officers who appeared aggressive, leading Jones to worry that Warfield would be assaulted. Jones did not see any officer punch Warfield and only saw the "very end" of the encounter, "right when Defendant Warfield gets taken down." After Jones' testimony, though, Warfield mentioned that he thought Jones may have been untruthful in his testimony.

[¶18.] Warfield then took the stand and testified that when he "pulled back from the TV set" that "guards were right—starting to come in [the day hall]." Then, he testified, he "did walk back towards them" with his hands down at his sides when they told him to "cuff up." It was then that he felt he had been sprayed with pepper spray, and he testified that his hands were still down at his sides while he was being sprayed. Warfield recalled walking up to four officers standing in a row but did not recall "bringing up my hands at any time" into a fighting position while being sprayed. After he walked up to the officers with his hands down at his side, however, Warfield testified he "can't remember everything that occurred at that time." In fact, he testified: "I don't recall the interaction that you guys see on the video. I don't recall that full interaction." Warfield did not recall swinging his fist at an officer or fighting with them. Rather, he testified that his intention behind breaking the TV and computer screen was to get "a major write up" to be sent back to the Penitentiary where he would have received medical attention for alleged neurological issues.

[¶19.] The State cross-examined Warfield, beginning with the surveillance video from the day of the incident. The video first shows Warfield walking into the day hall and striking the computer screen and TV screen as he admitted. The video then skips forward, leaving a four-second gap. When the skip begins, Warfield is standing facing the correctional officers. When the video resumes, Warfield admitted that it showed him "advancing" towards CO Day with a closed fist and that "[he] may be attempting to punch Officer Day" in the footage.

[¶20.] The video then shows Warfield striking CO Day, and other officers taking him to the ground to restrain him shortly thereafter. CO Day is not seen striking Warfield in the footage, and officers testified that CO Day assumed a defensive position and did not hit Warfield. It is Warfield's argument that the four-second skip in the video contained footage of officers "threatening" Warfield, and that his reaction was one of self-defense.

[¶21.] Before the case was submitted to the jury, the court again heard arguments on proposed instructions. The defense proposed a self-defense jury instruction, arguing "there has been sufficient evidence to at least go to the jury regarding self-defense." This evidence included, the defense argued, the officers "encircling" Warfield, officers spraying him with pepper spray, and Marc Jones testifying that he thought the force used by officers in taking Warfield to the ground "was excessive." In response, the State asserted Warfield had not met his burden of introducing sufficient evidence of "reasonable fear," and that no evidence indicated officers "went beyond the scope of their duties" in subduing Warfield.

[¶22.] The circuit court agreed. It decided the evidence presented was insufficient to give the self-defense instruction, reasoning that "the officers were simply directing him to cuff up, and that there was no indication of any kind that they were attempting to assault him in any way[.]" With regard to Marc Jones' testimony, the circuit court reasoned there was no evidence in Jones' testimony that would support self-defense, and "during Mr. Warfield's direct testimony, there was absolutely no evidence in support of self-defense. It was only in redirect, through many leading questions, that that even is on the table at a bare, minimum level."

[¶23.]     In considering jury instructions, the circuit court also allowed Warfield's counsel to renew Warfield's pro se motion to dismiss from October 2021 on due process grounds. Warfield maintained that charging and indicting him with both Counts 1 and 2 violated his Fifth Amendment protections against double jeopardy, and that the jury should not be instructed on both counts. The State argued it was allowed to submit both counts to the jury, but that these counts were alternative counts, and the jury could only find Warfield guilty of one count, not both. The circuit court agreed and allowed the State to submit both counts to the jury.

[¶24.]     The jury convicted Warfield of Counts 1—simple assault upon a correctional officer under SDCL 22-18-1(1); and 3—intentional damage to property under SDCL 22-34-1(1). He was acquitted on Count 2 of simple assault under SDCL 22-18-1(5). Warfield was sentenced on August 16, 2024, for Counts 1 and 3. As to Count 1, he was sentenced to two years in the State Penitentiary with payment of court costs. This sentence was ordered to run consecutively with Warfield's three prior convictions in Pennington County. As to Count 3, the circuit court ordered Warfield to pay restitution and court costs.

[¶25.]     Warfield appeals, raising five issues which we restate as follows:

1.     Whether the State properly charged Warfield with simple assault.

2.     Whether the circuit court erred when it allowed the jury to view Exhibit 1.

3.     Whether the circuit court abused its discretion in refusing to give Warfield's proposed self-defense jury instruction.

4.    Whether the State prevented Warfield from presenting a complete defense by failing to provide Warfield with additional surveillance footage both from the prison's back-up servers and a third camera angle.

5.    Whether the circuit court erred when it allowed the State to submit both Counts 1 and 2 to the jury.

## Analysis

### 1.    *Whether the State properly charged Warfield with simple assault.*

[¶26.]    Warfield first argues that the State should not have charged him with simple assault due to the four-second skip in the surveillance video, alleging there is "no documentation of the alleged assault" of CO Day.  The State argues in response that we have no jurisdiction to consider this issue, as it is an unreviewable decision involving prosecutorial discretion.  A prosecutor's charging decision is at the heart of the prosecution function, involving a broad exercise of discretion which is generally unreviewable on appeal unless the defendant alleges facts that raise due process concerns.  *See Commonwealth v. Cosby*, 252 A.3d 1092, 1135 (Pa. 2021) ("Charging decisions inhere within the vast discretion afforded to prosecutors and are generally subject to review only for arbitrary abuses."); *People v. Herndon*, 633 N.W.2d 376, 391 (Mich. 2001) ("We review a charging decision under an abuse of power standard, questioning whether a prosecutor has acted in contravention of the constitution or the law." (citation modified)); *State v. Tweeten*, 2004 N.D. 90, ¶ 8, 679 N.W.2d 287, 289 ("Generally, the prosecuting attorney is considered to be in the best position to evaluate the charges and the evidence to determine if prosecution should continue." (citation omitted)).

[¶27.]     Here, Warfield makes no argument that the State engaged in an arbitrary abuse of power by engaging in selective or discriminatory prosecution, which is a matter that would be reviewable by this Court. *See, e.g.*, *People ex rel. W.Y.B.*, 515 N.W.2d 453, 454 (S.D. 1994); *State v. Muetze*, 534 N.W.2d 55, 57 (S.D. 1995). Instead, his only argument is that he should not have been charged because "the State should have used its prosecutorial discretion and pressed forward" only with the charge of intentional damage to property. In the absence of any due process concerns, we decline to review the State's decision to charge Warfield with simple assault in this matter.

### 2. Whether the circuit court erred when it allowed the jury to view Exhibit 1.

[¶28.]     Warfield asserts the circuit court erred when it allowed the State to present to the jury Exhibit 1, the prison's video surveillance footage of the incident. He argues that the State "failed and neglected to preserve all of the videos of the incident," and that playing the video with the four-second skip violated his right to a fair trial. It is unclear from Warfield's briefing what his position is, but because he failed to object to the admission of Exhibit 1 at trial, we assume he argues the circuit court should have sua sponte excluded Exhibit 1. Warfield cites no authority to support his argument on this issue, and instead relies solely on the claim that the officers' testimony about the incident "is suspect to a degree" because of "the likelihood of bias or favoritism among fellow law enforcement officers." The State argues Warfield waived this issue by stating he had no objection to the exhibit and by using the four-second skip in the video as a basis to create reasonable doubt at trial. *See State v. Heer*, 2024 S.D. 54, ¶ 16 n.4, 11 N.W.3d 905, 910 n.4 ("Because

Heer affirmatively assented to Kamrath's introduction to the jury and her presence at counsel table, a colorable argument exists that Heer actually waived—not merely forfeited—his argument about the extent of Kamrath's involvement at trial."). Alternatively, the State argues the issue was forfeited and that Warfield has failed to demonstrate plain error. At the time Exhibit 1 was introduced into evidence and played for the jury at trial, Warfield did not object to its admission. In fact, Warfield relied on the footage and its contents several times for his defense theory. On this record, Warfield has affirmatively waived the issue for appeal.

### 3. Whether the circuit court abused its discretion in refusing to give Warfield's proposed self-defense jury instruction.

[¶29.] "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *State v. Tuopeh*, 2025 S.D. 16, ¶ 14, 19 N.W.3d 37, 45 (quoting *State v. Schumacher*, 2021 S.D. 16, ¶ 25, 956 N.W.2d 427, 433). "We have defined abuse of discretion as 'discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" *Id.* (quoting *State v. Carter*, 2023 S.D. 67, ¶ 24, 1 N.W.3d 674, 685). "Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice." *Id.* ¶ 14, 19 N.W.3d at 45–46 (quoting *State v. Ortiz-Martinez*, 2023 S.D. 46, ¶ 36, 995 N.W.2d 239, 246–47).

[¶30.] Self-defense is justified and available as an affirmative defense to simple assault when a person "reasonably believes that using or threatening to use

force is necessary to defend against [another individual's] *imminent* use of *unlawful*

force." SDCL 22-18-4 (emphasis added).

> However, a caveat to this defense lies in SDCL 22-18-2, which permits a law enforcement officer in the *performance of his or her legal duty* "to use . . . force . . . toward the person of another[.]" Furthermore, "[a]n individual is not justified in using force" to resist arrest "or other performance of duty by a law enforcement officer *within the scope of his [or her] official duties*." Under these rules, an individual is *only* justified in using self-defense against an officer if the officer is using *excessive force* or acting outside their lawful duty.

*People ex rel. N.A.*, 2021 S.D. 57, ¶ 24, 965 N.W.2d 433, 441 (alterations in original)

(citations omitted).

[¶31.] "Criminal defendants are entitled to instructions on their theory of the

case when evidence exists to support that theory." *State v. Bruder*, 2004 S.D. 12,

¶ 8, 676 N.W.2d 112, 115 (citation omitted). If the evidence supports an instruction

on self-defense, it is error not to give it. *Id.* But "[a] trial court need not instruct on

matters that find no support in the evidence." *State v. Chamley*, 310 N.W.2d 153,

155 (S.D. 1981).

[¶32.] Here, Warfield requested the jury be instructed on self-defense against

assault, the right to stand one's ground, and when an aggressor may have the right

to self-defense against assault. While settling the instructions, the State objected to

Warfield's proposed instructions and argued Warfield failed to present sufficient

evidence to argue "any type of justification for self-defense, or that he was in any

way acting in self-defense." The circuit court agreed and declined to give the

proposed instructions.

[¶33.] Warfield claims on appeal that the instructions were warranted because officers "encircled" him, and that he was afraid. In his brief, Warfield argues "[t]he jury should have been allowed, at the very least, to consider whether [Warfield] would have been justified in striking *back* at [CO Day.]" (Emphasis added.) The only evidence Warfield presented to support this claim was his own testimony that he was afraid, and Marc Jones' testimony that the officers "got aggressive with [Warfield]" and that CO Day lunged at Warfield while "trying to put restraints on him." Jones testified that while subduing Warfield after he struck the computer screen and TV, officers "picked [Warfield] up and slammed him on the ground." Jones further testified he "was afraid" that the guards would then "assault Mr. Warfield after him being picked up and slammed," but that he did not see any officer punch Warfield and only saw the "very end" of the encounter, "right when Defendant Warfield gets taken down." However, after reviewing the video, the takedown at the "very end" that Jones referenced occurred only *after* Warfield threw several punches at CO Day. Jones' additional comment that officers were "doing their job excessively" is simply a conclusory statement, unconnected to the correct legal standard for self-defense against a law enforcement officer.

[¶34.] In this case, where Warfield had just destroyed a computer screen with a hot pot and destroyed a TV with his fists, officers in the area acted lawfully and used force within the scope of their duties when "encircling" him in order to cuff him and ensure the safety of other inmates and the officers themselves. Nothing in the record indicates officers used unlawful force in the course of doing so, and Warfield even testified that he expected he would be cuffed after destroying prison property.

Even if he was "afraid," Warfield had no right to strike CO Day, and any such strike was not the result of self-defense.

[¶35.] Warfield did not present evidence to show any of the correctional officers used "excessive force" or acted "outside their lawful duty" in light of his behavior, and the circuit court did not make a choice outside the range of permissible choices by refusing to instruct the jury on self-defense.

> **4.    Whether the State prevented Warfield from presenting a complete defense by failing to provide Warfield with additional surveillance footage both from the prison's back-up servers and a third camera angle.**

[¶36.] Warfield next argues the State violated his constitutional rights when it did not provide him with video footage from the prison's back-up servers or the third surveillance camera angle. In making this argument, Warfield does not point to a specific ruling made by the circuit court for our review. Instead, he alleges a general violation of his Fourteenth Amendment right to present a complete defense, arguing that because "the proof of what really happened or, even what might have happened, was under the sole control of the State[,] . . . it appears that a *Brady* violation has occurred and [Warfield's] conviction should be set aside."

[¶37.] "The Due Process Clause of the Fourteenth Amendment includes an implicit guarantee that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *State v. Turner*, 2025 S.D. 13, ¶ 56, 18 N.W.3d 673, 691 (quoting *State v. Zephier*, 2020 S.D. 54, ¶ 20, 949 N.W.2d 560, 565) *reh'g denied* (Apr. 29, 2025). "The resulting body of decisional law from the United States Supreme Court and this Court exists under a topical heading that 'might loosely be

called the area of constitutionally guaranteed access to evidence.'" *Zephier*, 2020 S.D. 54, ¶ 20, 949 N.W.2d at 565 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

[¶38.] Cases involving a defendant's access to evidence generally fall into one of two categories—"cases in which the exculpatory value of the undisclosed evidence is known and cases where it is not." *Turner*, 2025 S.D. 13, ¶ 56, 18 N.W.3d at 691 (citation omitted). The former category includes the prototypical violation of the rule as set out in *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "A *Brady* violation occurs when (1) the evidence at issue [i]s favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence [has] been suppressed by the State, either willfully or inadvertently, and (3) prejudice [has] ensued." *State v. Peltier*, 2023 S.D. 62, ¶ 18, 998 N.W.2d 333, 339 (alterations in original) (quoting *State v. Delehoy*, 2019 S.D. 30, ¶ 25, 929 N.W.2d 103, 109).

[¶39.] The latter category includes "cases where the exculpatory value of undisclosed evidence is unknown because it has been destroyed, lost, or compromised in some way." *Turner*, 2025 S.D. 13, ¶ 58, 18 N.W.3d at 691 (citation omitted). The deleted surveillance footage from the third camera angle and back-up servers falls into the second category. In these cases, we apply the rule set out in *California v. Trombetta* to determine the materiality of evidence that no longer exists:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality . . . evidence must both possess an *exculpatory value that was apparent before the evidence was destroyed*, and be of such a

nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (emphasis added) (quoting *Trombetta*, 467 U.S. at 488–89).

[¶40.]     Here, Warfield argues the State's failure to provide him with access both to its back-up servers and to footage from the third camera angle in the day hall constitutes a *Brady* violation. With regard to the prison's backup servers, the circuit court provided Warfield with a court order to inspect the prison's servers and scheduled an inspection by Computer Forensic Resources, Inc. Because of a breakdown in the relationship between Warfield and the computer expert, however, this inspection never occurred.

[¶41.]     The delays in accessing the prison servers were as a result of Warfield's actions, and the circuit court found the State did nothing to conceal this evidence or intentionally prevent Warfield's access to it. Moreover, testimony at trial suggested that these servers contained the exact same footage provided to Warfield, and that the bandwidth issue that caused the four-second skip in the produced footage would have affected the back-up servers, too. Lee Kaufenberg testified that the four-second skip would be present on all versions of the footage, and that there was no way to "recover whatever portion is not recorded." Because of its identical nature, no evidence or testimony suggests this back-up footage contained an "exculpatory value that was apparent" before it was overwritten.

[¶42.]     Similarly, with regard to the third camera angle, nothing in the record and no evidence presented at trial suggests that the angle—which Kaufenberg testified did not contain direct sightlines like the two camera angles that were provided—contained exculpatory video footage that the first two cameras did not

capture. Again, all evidence presented at trial suggests this third camera angle would have also been affected by the four-second skip. Warfield's argument that "there would be no question what happened in that day hall" if the State had preserved the third camera angle or its back-up servers is unsupported.

[¶43.] Even if Warfield had established that this third angle contained exculpatory evidence, he must still show prejudice has ensued to warrant relief on appeal. *Peltier*, 2023 S.D. 62, ¶ 18, 998 N.W.2d at 339. "Prejudice ensues when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation modified). "A reasonable probability exists when evidence reasonably could be taken to put the whole case in such a different light so as to undermine confidence in the verdict." *Id.* (citation modified).

[¶44.] The jury here was presented with testimony from several officers who witnessed the incident, along with surveillance video footage from two separate angles, both of which adequately captured the incident. With this testimony in mind, video footage from a different angle could not have "put the whole case in a different light so as to undermine the confidence in the verdict." *Id.*

> **5.** **Whether the circuit court erred when it allowed the State to submit both Counts 1 and 2 to the jury.**

[¶45.] Lastly, Warfield argues that "being charged twice with the same offense against the same correctional officer subjected him to double jeopardy" in violation of his Fifth Amendment rights. "[I]ssues regarding multiplicity of charges are questions of law, which we review de novo." *State v. Chavez*, 2002 S.D. 84, ¶ 10,

649 N.W.2d 586, 591 (citing *State v. Blakey*, 2001 S.D. 129, ¶ 5, 635 N.W.2d 748, 750).

[¶46.]     The South Dakota Constitution provides that "[n]o person shall be . . . twice put in jeopardy for the same offense." S.D. Const. art. VI, § 9. "These prohibitions against double jeopardy protect against three types of governmental abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *State v. Johnson*, 2007 S.D. 86, ¶ 12, 739 N.W.2d 1, 6 (citation omitted). Warfield alleges only the third type of abuse is at issue here.

[¶47.]     Warfield maintains that both Counts 1 and 2 should have been dismissed and should not have gone to the jury under *State v. Chavez*. In *Chavez*, the defendant was charged with six counts of aggravated assault after he fired a weapon at two officers conducting a search warrant at his house. 2002 S.D. 84, ¶¶ 6–7, 649 N.W.2d at 590–91. Like Warfield did here, Chavez filed a motion to dismiss the indictment on multiplicity of charges grounds, but the circuit court denied the motion. *Id.* ¶ 8, 649 N.W.2d at 591. After a jury trial, Chavez was convicted of all six counts of aggravated assault and two counts of commission of a felony with a firearm. *Id.* The circuit court "imposed concurrent fifteen-year sentences for each one of the six aggravated assault convictions." *Id.* Chavez appealed, arguing he was improperly charged "with multiple crimes based on the fact that all eight charges stemmed from the same set of facts." *Id.* ¶ 12, 649 N.W.2d at 592.

[¶48.]    On appeal, we held Chavez could only be *convicted* and *sentenced* for one count of aggravated assault as to each officer he assaulted, which would result in two convictions. *Id.* ¶¶ 17–18, 649 N.W.2d at 593. "We acknowledge[d] that if there is a single transaction resulting in more than one crime, each crime must have been the result of separate factual incidents. A defendant cannot receive two convictions for one crime unless the Legislature intended multiple punishments." *Id.* ¶ 15, 649 N.W.2d at 592–93 (citation modified). In other words, it is not "permissible to *punish* a defendant more than once for one offense in violation of a single statute." *Id.* ¶ 16, 649 N.W.2d at 593 (emphasis added).

[¶49.]    Warfield relies on *Chavez* to support the argument that being *charged* with two offenses against the same officer violated his double jeopardy rights. But *Chavez* does not stand for the proposition that defendants cannot be charged with more than one offense arising from the same transaction. In fact, we have held several times that in deciding how to charge a defendant, "[t]he State is not required to pick between two viable theories that are supported by the evidence." *State v. Manning*, 2023 S.D. 7, ¶ 36, 985 N.W.2d 743, 755; *see also State v. Washington*, 2024 S.D. 64, ¶ 61, 13 N.W.3d 492, 510. Rather, *Chavez* stands for the principle that a defendant "cannot be *punished* more than once for identical facts under varying subsections" of a statute. 2002 S.D. 84, ¶ 18, 649 N.W.2d at 593 (emphasis added).

[¶50.]    The circuit court held "the State has the right to proceed on alternative bases" under SDCL 23A-6-25. It explained that they do not have to assert them in the alternative formally in the indictment, but they cannot seek sentences for both.

#30929

The circuit court's decision is in-line with our current precedent and most recent decision in *State v. Tuopeh*:

> Indeed, our most recent cases addressing double jeopardy claims have recognized that the primary issue is not how multiple counts are submitted to the jury, but rather whether multiple convictions and sentences for the same act are entered for the same conduct. We have thus noted that the principles safeguarding the right to be free from double jeopardy do not preclude the prosecution from charging multiple separate counts arising from the same conduct "in order to meet the evidence which may be adduced[.]"

2025 S.D. 16, ¶ 20, 19 N.W.3d at 47 (alteration in original) (quoting *Washington*, 2024 S.D. 64, ¶ 61, 13 N.W.3d at 510). Warfield was subsequently convicted on Count 1 and sentenced on Count 1. The circuit court committed no error in submitting Counts 1 and 2 to the jury, and Warfield suffered no double jeopardy violation as a result. We affirm.

[¶51.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.